AERO CORPORATION, Plaintiff,

v.

DEPARTMENT OF THE NAVY, Defendant.

Civ. A. No. 79-2944.

United States District Court, District of Columbia.

March 4, 1981.

Roger N. Boyd, Jean-Pierre Swennen, Frederick W. Claybrook, Jr., Crowell & Moring, Washington, D.C., for plaintiff.

Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth, Cameron McGowan Currie, Asst. U. S. Attys., Washington, D.C., for defendant; Jeffrey N. Eisenstein, John G. Judy, William K. Mahn, Dept. of the Navy, Washington, D.C., of counsel.

## MEMORANDUM

OBERDORFER, District Judge.

### I

This case involves the claim of plaintiff, Aero Corporation ("Aero"), that the determination of defendant, Department of the Navy ("Navy"), to make a sole-source award of a contract to perform the Service Life Extension Program ("SLEP") on twenty C–130 aircraft to Lockheed-Georgia Company ("Lockheed") was improper. Aero also seeks mandamus to compel the Navy to refer the question of Aero's capability to perform the contract for determination by the Small Business Administration.

Aero filed this action on October 30, 1979, four days after filing a bid protest with the General Accounting Office ("GAO"). Following hearings on Aero's request for a temporary restraining order on October 30 and 31, the Court declined to grant any injunctive relief because the Navy represented that award of the sole-source contract to Lockheed was not imminent. The parties were directed to agree to an expedited discovery schedule to permit an early decision on the merits by the GAO. Counsel negotiated a stipulation providing for (1) expedited discovery and (2) an agreement by the Navy not to award the contract until November 30, 1979, or until the GAO decided Aero's protest, whichever was sooner. By Order of November 1, 1979, the Court approved the stipulation and requested that the GAO expedite its consideration of the protest to provide an interim report on or before November 16, 1979.

On November 16, the GAO notified the Court and the parties that a decision on the protest would not be available before December 18, 1979. Consequently, the Court held hearings on November 19 and 20, 1979, to consider whether relief was necessary pending a decision by the GAO. At those hearings, Aero renewed its request for a preliminary injunction; the Navy reasserted its position that the SLEP program, and the Navy's consequent ability to meet its operational requirements, would be jeopardized if it did not award a contract by November 30, 1979. The Navy represented that (1) no aircraft would be "inducted" into SLEP before May, 1980, and (2) any contract with Lockheed could be terminated without prejudice to Aero if the GAO or the Court so directed.

On the basis of the Navy's representations and arguments of counsel, the Court entered an Order on November 21 denying Aero preliminary relief. The Order also embodied a Declaratory Judgment that the Navy had breached its statutory duty under 10 U.S.C. § 2304 and 2310 to facilitate review by the Court and the GAO of its decision to make a sole-source award. The Order further declared that the Navy "should not enjoy any equitable or legal advantage on account of the award of the contract, its performance in whole or in part, or the mere passage of time between now and December 31, 1979." The Order left the Navy free to enter into a letter contract with Lockheed for SLEP. The Navy and Lockheed executed such a contract on November 30, 1979. The contract called for the performance of SLEP on 13 planes, with an option to increase the total to 20 C–130's.

The Order of November 21, 1979, as further explained by Memorandum of November 28, 1979, was predicated on an indication from GAO that it could render a decision in Aero's bid protest, Docket No. B–194445.3 by December 18. The relief granted was intended to preserve the equities, while permitting the Navy and Lockheed to begin necessary pre-performance activities pending the GAO decision.

On December 14, the GAO, through its Associate General Counsel, informed the Court that it would not be able to render a decision on December 18, but was "making every effort to have a decision by December 21." At a hearing held that afternoon to consider the effect of the delay, plaintiff sought (1) to extend the effect of the Declaratory Judgment beyond December 31, if the hearing on the preliminary injunction, then scheduled for December 21, were delayed; (2) to prevent the Navy from exercising its option to expand the initial SLEP contract from 13 to 20 planes; (3) to limit the contract already in force to the preparation of parts, for which Aero has not sought to compete; and (4) to require the Navy to prepare a competitive bid package in the event that the contract was ruled invalid.

In response, the Navy represented that it would limit the option for the additional planes to the procurement of parts only. The Navy also asserted that in the event that SLEP installation were ultimately opened for competitive bidding, Lockheed would accrue no competitive advantage from its part-performance of the letter contract, since any parts or plans prepared by Lockheed would become the property of the U.S. Government.

In view of these representations, the Court found that Aero was suffering no prejudice from the prospective delay in the GAO decision, and declined to modify the relief already granted.

On December 21, the GAO reached its decision on Aero's bid protest, a copy of which is attached hereto as Appendix I. The GAO found that the Navy's decision to award a sole-source contract to Lockheed for 13 planes was not arbitrary. On the same day, a hearing was held on Aero's further motion for a preliminary injunction, at which it was decided to conduct a final hearing on the merits on February 4 and 5, 1980. An Order filed December 21, 1979, amended the Order of November 21 to reflect additional representations by the Navy that (1) none of the C–130 aircraft would be "inducted" into SLEP before February 5; and (2) that the Navy would not exercise the option for the installation portion of SLEP for the seven additional aircraft before February 5, 1980.

On January 30, 1980, Aero filed a Pretrial Brief. On February 1, 1980, the Navy filed a motion for summary judgment. The Court has elected to treat the parties' submissions as cross-motions for summary judgment, supported by exhibits, affidavits and testimony which eliminate any material factual dispute. Having reviewed these submissions, and on the basis of the hearings and entire record of this case, the Court finds that the Navy is entitled to partial summary judgment; its determination that competitive procurement of SLEP for the first 20 C–130's was reasonable and supported by substantial evidence. Aero is entitled to partial summary judgment on its claim that under the circumstances of this case, the Navy prevented Aero from obtaining timely and meaningful review of the Navy's procurement decision before this Court and the GAO. The Navy is also entitled to summary judgment on Aero's assertion that its capability to perform SLEP must be referred to the Small Business Administration for determination.

On February 8, 1980, Aero filed a motion pursuant to Rule 21, Fed.R.Civ.P., to add the Lockheed Corporation as a defendant. Both Lockheed and the Navy have opposed the motion, which the Court will deny without prejudice to its renewal by Aero if the presence of Lockheed as a party ultimately proves appropriate in order to accord Aero complete relief.

II

*Findings of Fact:*

1. The program at issue is the Service Life Extension Program ("SLEP") of forty-nine Navy and Marine Corps C–130 series aircraft.

2. SLEP is a program to replace or restore parts of the aircraft to extend its service life to 25,000 flight hours.

3. SLEP provides for the replacement of approximately thirty-nine parts regardless of whether they are in immediate need of service, with the exception of three parts that are inspected and replaced only if necessary. SLEP also involves several miscellaneous tasks, including upgrading field manuals and related functions.

4. Three aircraft series are included in the program: the C–130 itself, as well as the KC–130's (tankers used by the Marine Corps), and EC–130's. The EC–130's are so-called "TACAMO aircraft" that are used for communications with fleet ballistic submarines.

5. SLEP involves both the procurement and the installation of parts required to extend the life of the C–130 aircraft. The dispute underlying this action involves Aero's interest in competing for the installation phase of SLEP.

6. The Navy's C–130 fleet is currently maintained through periodic induction for Standard Depot Level Maintenance ("SDLM") and through drop-in repair. Under the SLEP program, the Navy plans to perform SDLM concurrently with SLEP.

7. Under SDLM, each aircraft is inspected and parts are replaced as necessary. Drop-in repair is performed by the SDLM contractor on aircraft in need of repair prior to the next regular SDLM induction.

8. Aero has won all competitive NAVY SDLM procurements for the C–130 and has been the exclusive SDLM contractor for the Navy in the United States for the past nine years. Aero's current SDLM contract with options extends into 1983. The Navy proposes to award contracts to Lockheed on a sole-source basis for SLEP and concurrent SDLM with respect to forty-nine aircraft. This plan will foreclose Aero's SDLM business opportunity to render SDLM service with respect to these C–130's.

9. Navy planning for SLEP began in January of 1977 with the establishment of a C–130 SLEP program subject to formal procurement planning in accordance with the Defense Acquisition Regulation ("DAR") § 1–2100. This required a procurement plan to be prepared to present an analysis of the program and to document the technical, small business, policy, operational, and other procurement considerations.

10. On February 10, 1978, the Cognizant Field Activity ("CFA") for the C–130 aircraft, the Naval Aircraft Rework Facility ("NARF"), forwarded to the Naval Air Systems Command ("NAVAIR") a detailed Work Requirements Specification for SLEP which identified the parts requiring replacement during SLEP.

11. On February 24, 1978, Lockheed was provided with a copy of the work specification and commissioned to prepare two Engineering Change Proposals ("ECP") under contract with the Navy, one ECP for accomplishing SLEP at a facility other than Lockheed utilizing kits prepared by Lockheed, the other ECP for accomplishing SLEP entirely by Lockheed without the use of kits.

12. On May 23, 1978, the Navy's project manager for the C–130 SLEP program notified the other team members that he would recommend to the NAVAIR Acquisition Program Review Board ("APRB"), which is composed of the senior decision-making authorities within NAVAIR, that Lockheed perform the entire SLEP program "in house," i. e., under a sole-source contract. The Project Manager based his recommendation on the grounds that (1) the cost of a kit program would substantially exceed that of an integrated program in which Lockheed manufactured and installed the parts; and (2) a kit program would delay by at least one year the induction of the first aircraft into SLEP, which was then scheduled for May, 1979. This delay was alleged to be critical because many of the aircraft would require interim repairs.

13. At a meeting on June 9, 1978, the APRB agreed that NAVAIR should contract with Lockheed for initial performance of SLEP on a non-competitive basis and that NAVAIR should develop an alternative plan for transition to a competitive procurement for the installation of kits after two years. The APRB anticipated meeting again in four weeks to consider revisions to the procurement plan consistent with its conclusions. That meeting did not take place.

14. On August 14, 1978, Lockheed submitted the Engineering Change Proposals requested in February, 1978. The ECP's included separate schedules for sole-source and competitive procurement of SLEP.

15. The sole-source schedule proposed by Lockheed in its August ECP's provided for induction of the first aircraft into Lockheed one year after the award of the contract.

16. The competitive schedule proposed by Lockheed in its August ECP's provided for the availability of the first trial kit twenty-five months after the award of the contract. It provided for the first production kit, which it acknowledged could be installed by a contractor other than Lockheed, in forty-six months.

17. On March 13, 1979, Aero advised the Navy's SLEP project manager of its interest in participating in SLEP. Along with its letter, Aero submitted an analysis based on the February 10, 1978, work specifications for performing all the SLEP tasks. The Aero analysis claimed that Aero had the expertise to perform the installation of SLEP parts without technical direction or assistance from Lockheed. The Aero letter also protested any sole-source procurement of SLEP from Lockheed.

18. Of the forty-four tasks Aero identified from the SLEP work specification, Aero had performed thirty-nine during SDLM without the use of kits by manufacturing or ordering the parts directly and employing installation instructions developed by Aero and approved by the Navy.

19. The revised SLEP work specification identified thirty-nine installation tasks. Aero has performed thirty-seven of the thirty-nine SLEP tasks.

20. On March 22, 1979, pursuant to the APRB directive of June, 1978, the project manager of SLEP circulated a memorandum proposing that the Navy utilize a directed (sole-source) procurement to Lockheed for SLEP of the first ten aircraft with a phased transition thereafter to competitive installation with kits provided by Lockheed.

21. On March 26, 1979, Aero filed a bid protest with the GAO, Docket No. B–194445, alleging that the Navy was "poised to make a sole-source award for the C–130 SLEP work without the benefit of free and open competition." The Navy responded on April 30, contending that the protest was "based upon incorrect information." The Navy contended that "NAVAIR has not as yet made a decision as to the procurement method to be utilized in fulfilling the C–130 SLEP requirements . . . . On June 5, 1979, the GAO dismissed Aero's protest as premature.

22. Meanwhile, on April 25, 1979, the SLEP project manager circulated an implementation plan for SLEP prepared "in accordance with the decision of the Acquisition Program Review Board of 9 June 1978 . . . . This plan called for directed procurement to Lockheed for (1) complete modification of ten aircraft under SLEP; (2) the non-recurring engineering effort necessary for the preparation of kits; (3) three trial kits; and (4) an option for installation of the trial kits.

23. On July 12, 1979, the Navy rejected Aero's proposal on the technical ground that it did not meet the requirements for "unsolicited" proposals under DAR § 4–901.

24. On June 29, 1979, the APRB convened again to consider the C–130 SLEP procurement plan. The plan submitted for the APRB's approval was, in all major respects, the implementation plan of April 25.

25. The June, 1979, plan assumed contract award in July, 1979, and proposed two schedules for competitive installation of kits. The first schedule, characterized as "Optimistic," provided for the induction of the first aircraft under a competitively awarded kit installation contract forty-two months after the award of the initial contract to Lockheed. Under that schedule, the first competitive aircraft would be inducted in January, 1983. The other schedule, characterized as a "Normal Flow Time" schedule, was based on the Lockheed schedule and anticipated induction of the first aircraft in sixty-four months.

26. Under the "Optimistic" schedule, seventeen months would elapse between the induction of the last plane under the sole-source contract with Lockheed and the induction of the first plane under a competitively awarded installation contract (August, 1981, to January, 1983). Under the "Normal Flow Time" schedule, thirty-nine months would elapse between the induction of the last plane by Lockheed and the first plane inducted under a competitively awarded installation contract (August, 1981, to November, 1984).

27. The APRB approved the plan to complete all planes after the first ten in a kit program based on the "Optimistic" schedule, but directed the project manager to address the schedule risks inherent in the plan.

28. The plan, as approved by the APRB, was approved on July 13, 1979, by Admiral Petersen, Commander of NAVAIR, and was forwarded to the Chief of Naval Material ("CNM") for final approval. At the direction of the CNM, NAVAIR officials met with Lockheed on August 28, 1979, to consider the feasibility of meeting the "Optimistic" schedule. Lockheed indicated that the schedule of its August, 1978, ECP had been predicated on the award of the contract by February 1, 1979. Because of the

**564**

delay and the increased long lead times for certain SLEP parts, Lockheed indicated that it could only meet a schedule which provided for the induction of the first competitive installation in sixty-four months and that it could not meet the "Optimistic" schedule.

29. The Lockheed schedule is based on the assumption that the procurement of all parts for SLEP begins after contract award. The estimates for procurement of long lead items are based on the general industry procurement time from the date of order to the date of delivery.

30. During the August 28, 1979, meeting, NAVAIR representatives asked Lockheed whether they could reduce the time required for delivery of kits. Lockheed responded that its schedule was the best achievable.

31. Also on August 28, 1979, the Navy requested the Air Force Plant Representative at Lockheed to evaluate Lockheed's proposed timetable. The representative reported that Lockheed's schedule was "basically realistic, albeit conservative". The representative reported that the engineering effort, trial installation, rework, and verification may have been overstated by as much as twenty percent. The representative also reported, "It is believed that the contractor may be exaggerating impact of these delays and changes on long leadtime material, since most of that processed to date will be diverted to regular production requirements  .   .  .. [I]t appears to this office that the contractor can and will have the same flexibility to divert landing gear and other components from and to subsequent production lot releases." In

fact, Lockheed engaged in substantial pre-contractual effort with respect to the procurement of SLEP parts, and the Navy and Lockheed have now contracted for the SLEP parts for the initial twenty aircraft to be inducted into SLEP.[1]

32. Aero had filed a second bid protest with the GAO on July 10, 1979, Docket No. B–194445.2, alleging that the Navy "has clearly decided" to award the SLEP contract on a sole-source basis. Although the APRB plan had been approved on July 13, 1979, by the Commander of NAVAIR, the Navy nevertheless contended to GAO on August 28, 1979, that Aero's protest was premature. On October 17, 1979, GAO dismissed Aero's second protest as premature.

33. On September 14, 1979, the CNM returned the procurement plan to NAVAIR for revision in light of the schedule proposed by Lockheed at its August 28 meeting with the Navy.

34. On September 25, 1979, the NAVAIR APRB was again convened to consider changes in the procurement plan. The APRB approved a procurement plan that called for the sole-source modification of all 49 C–130's by Lockheed.

35. On October 15, 1979, the final SLEP procurement plan was approved by Admiral Petersen. The plan called for the directed procurement to Lockheed of all forty-nine aircraft for concurrent SLEP and SDLM and an initial contract award for the first thirteen planes by November 20, 1979, with induction of the first aircraft in May, 1980. In the intervening six months, Lockheed would draft detailed engineering specifications, procure the necessary parts, and prepare the work area.

1. At the hearing on February 5, 1980, the Navy introduced the testimony of a Lockheed official that the parts so procured were "production configuration" parts that were so machined and drilled that they could be installed only by Lockheed, and were not suitable for inclusion in kits for installation by potential SLEP contractors such as Aero, or by Aero as SDLM contractor. The effect of this parts procurement was to substantially increase the time advantage for a sole-source procurement of SLEP over competition-by-kit procurement, since many of the parts necessary for SLEP were already in hand when Lockheed was awarded the letter contract in November, 1979. Thus, Lockheed's pre-contractual procurement substantially exaggerated the schedule advantages of a sole-source SLEP over competition. Lockheed suffered no serious risk by its parts procurement, since the parts ordered in anticipation of being awarded the SLEP installation contract could have been diverted to C–130 production had the Navy determined to proceed competitively. Under separate contracts Lockheed was producing about 30 new C–130's per year.

36. The final procurement plan was forwarded to the CNM for his approval on October 15, 1979. On October 24, 1979, the CNM approved the final procurement plan with the understanding that "C–130 series aircraft scheduled for SLEP/SDLM at Lockheed will be considered for induction at the then current SDLM contractor's facility in the event a substantial delay occurs in the scheduled SLEP and a SDLM is determined necessary to sustain the material condition of the aircraft."

37. On October 24, 1979, the contracting officer filed formal "Determination and Findings" that the proposed contract could be negotiated without formal advertising pursuant to 10 U.S.C. § 2304(a)(10), which provides an exemption from a competitively advertised procurement when "it is impracticable to obtain competition by formal advertising." The contracting officer found that because of the long period of time required to prepare and manufacture kits necessary for the installation of SLEP by a contractor other than Lockheed, only Lockheed could perform SLEP "with an acceptable level of technical risk in a time frame to prevent an adverse impact on fleet operational readiness."

38. The Navy concluded that the delay generated by relying on a kit program would prevent it from meeting its operational requirements. The C–130s are TACAMO aircraft that provide communications with fleet ballistic missile submarines. Delay in inducting the TACAMO aircraft would interfere with the "TIP II" modification schedule, in which communications gear for the aircraft is to be replaced concurrently with SLEP. Additionally, delay in performing SLEP would increase the risk that these aircraft would be grounded, thus preventing the Navy from meeting its operational responsibilities.

39. The Navy concluded that because of the material condition of the C–130 and KC–130 aircraft, delay in inducting them into SLEP would increase the risk that they would have to be grounded or removed from service for unscheduled maintenance. Loss of these aircraft would jeopardize the Navy's ability to meet its operational requirements.

40. The Navy's planning for a kit modification program contemplated a kit usable by any qualified depot level contractor, and did not focus on use by contractors with substantial experience with the C–130 by virtue of SDLM or similar service. However, the Navy determined that preparation of kits tailored to experienced C–130 contractors would not materially reduce the time required to prepare kits for competitive procurement.

41. On November 30, 1979, the Navy awarded a contract to Lockheed for the SLEP and accompanying SDLM for three EC–130, nine KC–130, and one C–130 model aircraft, subject to the Navy's representations and the Court's orders with respect to the induction of those aircraft for installation purposes. The contract contained an option for seven additional aircraft (two EC–130's and five KC–130's). The Lockheed contract forms which specify the data required to be supplied by Lockheed to the Navy (DD 1423 forms) had been signed by the responsible government official on March 27, 1979.

42. The option for the purchase of parts for the seven option aircraft was exercised by the Navy in January, 1980. The Navy has represented to the Court that the option for installation of parts in the option aircraft will not be exercised until October, 1980.

43. On December 21, 1979, the GAO issued its decision in Aero's third protest. The GAO concluded that a limited award to Lockheed of thirteen aircraft on a sole-source basis was proper in the circumstances. In support of this conclusion, the GAO made the following findings: (1) The Navy did not abuse its discretion in estimating that the technical risk in performing SLEP is greater than that in performing SDLM; (2) While SLEP might be performed using something less than a comprehensive kit by experienced C–130 maintenance contractors, the Navy reasonably concluded that even these contractors would have to employ some form of kit; (3) The GAO was

"aware of no legal requirement for the Navy to provide kits specially tailored to a limited group of maintenance contractors, such as Aero, regardless of whether Navy could have or should have arranged the kits earlier;" and (4) The Navy reasonably concluded that the development of kits is not feasible in the time frame for performing SLEP.

44. The GAO recommended that the Navy review the sole-source determination before exercising the option for the seven additional aircraft in the letter contract and further review it before awarding a follow-on contract for all or part of the other twenty-nine aircraft.

45. Despite expedited consideration the GAO required approximately two months to consider Aero's third bid protest and issue its findings and conclusions. Because the Navy urged that any delay in awarding a contract for SLEP might seriously jeopardize the national defense, the parties, at the direction of the Court, substantially telescoped discovery and other pre-trial proceedings, and the Court has expedited its decision. Nevertheless, the time from complaint to decision consumed four months. Review of Aero's claim by the GAO and the Court was handicapped by the schedule constraints imposed by the Navy.

## III

*Conclusions of Law:*

### A.

■ The Court's scope of review in this case, as in disappointed bidder cases, is limited. As our Court of Appeals elaborated in *M. Steinthal and Co. v. Seamans,* 147 U.S. App.D.C. 221, 455 F.2d 1289 (1971):

> The court is obligated to restrict its inquiry to a determination of whether the procurement agency's decision had a reasonable basis. This inquiry must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. Such discretion extends not only to the evaluation of bids submitted in response to a solicitation but also to de-

> termination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements.

> \*    \*    \*.    \*    \*    \*

> The court must refrain from judicial intervention into the procurement process unless the actions of the executive officials are without any rational basis.

147 U.S.App.D.C. at 233, 238, 455 F.2d at 1301, 1306 (footnote omitted.)

Since *Steinthal,* the Court of Appeals has further refined the standard of review. In *Kentron Hawaii, Ltd. v. Warner,* 156 U.S. App.D.C. 274, 277, 480 F.2d 1166, 1169 (1973), the Court held that to prevail, plaintiffs "adversely affected by the award of government contracts" must:

> bear a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

■ Although there is an overriding public interest, expressed by statute, to foster competition in procurement to the maximum practical extent, *see Wheelabrator Corporation v. Chafee,* 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971), the public is also concerned with procurement that is expeditious and undisrupted. *See M. Steinthal & Sons v. Seamans,* 147 U.S.App.D.C. at 232, 455 F.2d at 1300. This is especially true in military procurements. *See Cessna Aircraft Company v. Brown,* 452 F.Supp. 1245, 1253 (D.D.C.1978).

■ Review by the GAO, an agency with "special competence and experience" in the complicated area of procurement regulation, *Wheelabrator Corporation v. Chafee,* 147 U.S.App.D.C. at 248, 455 F.2d at 1316, plays an integral role in this process. It is well-established that the Court must accord significant deference to the findings and conclusions of the GAO; ordinarily, they are not to be overturned unless the Court finds them to be arbitrary and capricious. *See M. Steinthal & Sons v. Seamans,*

147 U.S.App.D.C. at 237, 455 F.2d at 1305. Indeed, our Court of Appeals has twice reversed injunctions granted by the district courts in procurement cases because the district courts failed to find that GAO conclusions, upon which they refused to rely, were "arbitrary and capricious." *M. Steinthal & Sons v. Seamans*, 147 U.S.App.D.C. at 230, 455 F.2d at 1298; *Schoonmaker v. Resor*, 144 U.S.App.D.C. 250, 252, 445 F.2d 726, 728 (1971). However, a court has "the last word and should not shrink from exercise of its power when the conditions justify an injunction." *Wheelabrator Corporation v. Chafee*, 147 U.S.App.D.C. at 248–49, 455 F.2d at 1316–17. As the Court of Appeals for our circuit noted in *Steinthal*, there may be instances where a district court will find illegality that the GAO refused to recognize or to correct. In such cases, it is the clear duty of the district court to ensure that procurement activities are carried out in accordance with the applicable statutes and regulations. 147 U.S.App.D.C. at 237–38, 455 F.2d at 1305–06.

■ In this case, plaintiff's claim has been reviewed by both the GAO and the Court. The Court has reviewed the voluminous documentary submissions of the parties, as well as the GAO, and has heard the testimony of six witnesses.

This record demonstrates that the Navy's decision to award the first SLEP contract to Lockheed was not unreasonable, is supported by substantial evidence, and is not a clear and prejudicial violation of existing statutes.

■ Aero has ably and elaborately demonstrated that there is a difference of opinion about the technical complexity of SLEP, the manner in which the modification might be performed, and the level of expertise and technical assistance that a depot level contractor would require to carry out SLEP. The potential cost savings that competition might provide are manifest. It is uncontroverted, for example, that Aero's hourly labor rate is only one-third of Lockheed's. Moreover, it may well be that the Navy has not given sufficient weight to its long-range need to maintain a broad, competitive pool of experienced contractors and to lessen its dependence upon a single contractor, in this case, the developer and sole manufacturer of the C–130, Lockheed. It may not have fully recognized, or responded to, the public interest, including national security interest, in competition for procurement, as generally mandated by Congress. The testimony of Captain Ferraro, Assistant Commander of NAVAIR for contracts, revealed that, throughout this procurement, the Navy was not enormously sensitive to its statutory duty to provide competition to the maximum practical extent. It did not apply to this element of its "mission" the same energy and ingenuity that it did and does to other responsibilities. Yet it is even more plain that it is not the role of the Court to second-guess the Navy, particularly as to its operational requirements, its judgments about the technical complexity of its projects, or the level of risk that it must accept. Captain Ferraro's testimony also made clear that the Navy's ultimate judgment that (1) the technical complexity of SLEP made some form of kits necessary if the modification were performed by a contractor other than Lockheed; and (2) the projected time schedule for the development of kits would not permit the Navy to meet its operational requirements, was made in honesty and good faith and was not unreasonable. Each of its conclusions was supported by substantial evidence.

### B.

The conclusion by the GAO and the Court that the Navy's sole-source decision for the first SLEP contract was not unreasonable, however, does not constitute approval of the entire procurement process. The Navy did consider means by which the SLEP contract might have been completed. But the Navy (1) failed to meet its statutory duty and (2) failed to permit the GAO and the Court an adequate opportunity to determine whether the Navy had met that duty.

In its decision, the GAO stated that it was "aware of no legal requirement for the Navy to provide kits specially tailored to a

limited group of maintenance contractors, such as Aero . . .." This conclusion was erroneous. The Navy, as the GAO put it, "is required to seek competition where it can find it." In this case, competition might have been found among the experienced C–130 depot level maintenance contractors such as Aero, even if it might not feasibly have been found among a larger group. And if providing kits specially tailored to such a limited group of maintenance contractors is a feasible way of seeking competition, the Navy has a legal duty to provide such "tailored kits."

The mandate of section 2304(g) of the Act, 10 U.S.C. § 2304(g), is clear—competition is required to the maximum extent feasible by solicitation of proposals "from the maximum number of qualified sources consistent with the nature and requirements of the supplies or services to be produced." DAR § 3–101(d) provides that negotiated procurements must be on a competitive basis "to the maximum practical extent." If the nature of the services in SLEP is such that providing limited kits is the only means of obtaining any competition at all, the Navy must do so, if it can be done practically.

As to the first 20 aircraft, the Navy has sufficiently justified as not unreasonable or legally impermissible its decision that the use of kits tailored to experienced C–130 contractors would not have been feasible in the time frame which is immediately imminent. However, it has not satisfied the GAO or the Court that it now has a reasonable basis for precluding competition for SLEP procurement with respect to the balance of the procurement.

▮ Additionally, on the basis of the whole record in this case, the Court reaffirms its finding of November 21, as explained by the Memorandum of November 28, that the Navy breached its statutory duty to facilitate GAO and judicial review. Although the record supports no imputation of bad faith on the part of the Navy, it is clear that as early as June, 1978, and certainly as early as April, 1979, the Navy had determined to employ sole-source procurement for the first aircraft to be inducted into SLEP. The Navy maintains that this decision never ripened into a formal decision, approved by the final Navy decision-making authority, the CNM, until October, 1979. This may be true. But such formalistic notions of finality must bend to the realities of this case: The decision to employ sole-source for the first C–130's was essentially irreversible at the latest in April, 1979, and both the Navy and Lockheed were proceeding on the solid assumption that at least some of the planes would be modified by Lockheed. Throughout this period, the only change in the procurement plan was to increase the number of planes to be modified sole-source by Lockheed. At the same time, the Navy was aware of Aero's interest in competing for some or all of the contract and its intention to challenge any sole-source decision before the GAO. The Navy had ample opportunity, without disruption of its planning, to submit its decision as to the first thirteen planes for GAO review, or at least not to urge deferral of GAO's consideration of Aero's protest. As the Court noted in its November 28 Memorandum, for example, the Navy "might have filed an interim procurement plan as to the first thirteen aircraft, updating it as necessary pursuant to DAR § 1–2100.5 when the Navy settled on a plan for the remaining C–130's." Indeed, the ability of the Navy to have submitted its SLEP plans for GAO and judicial consideration in phases is amply demonstrated by the facts of this case: although the procurement plan approved by the Navy in October, 1979, called for the sole-source procurement of SLEP for all 49 C–130's, the contract ultimately executed with Lockheed covered only the first 20 planes. The Navy-Lockheed actions in the six months between April and October, 1979, served no material planning or operational purpose of the Navy, and had as its principal apparent effect frustration of Aero's opportunity to obtain considered review of the decision by GAO and this Court. The Navy freely and strongly invoked national defense concerns in pressing the GAO and the Court to act in great haste, to review in days or weeks a

decision which the Navy required over two years to make, creating the impression that the Court had a dramatic choice between doing its duty under the law and the Constitution or jeopardizing the Navy's ability to defend the Nation. In these circumstances, the Navy's failure to facilitate GAO consideration of Aero's earlier protests was a breach of its duty, and seriously interfered with the ability of the GAO and of this Court to perform their duties.

Neither of these failures by the Navy justifies interference with its plans for the first 20 planes. However, they do require the fashioning of a remedy that will guarantee *first* that the Navy further considers all possibilities for competing some or all of SLEP for the remaining planes and *second* that Aero have a full and early opportunity to protest any decision to procure SLEP for these planes on a sole-source basis in time for deliberate GAO and judicial review. Accordingly, an accompanying Order will require the Navy to reconsider its decision not to compete SLEP after it acquires experience from the initial SLEP installations, and notify all potential competitors for SLEP, including Aero, at the earliest practicable time, of any practically irreversible plans to undertake further SLEP procurement on a sole-source basis.

### C.

The Court has further considered the parties' cross-motions for summary judgment on Aero's claim that the issue of Aero's capability to perform SLEP be submitted to the Small Business Administration for determination. For the reasons set forth in the GAO opinion, the Court finds that SBA referral is inappropriate, and that the Navy is entitled to summary judgment on this claim.

### D.

There remains for consideration Aero's motion to add Lockheed Corporation as a defendant, which was filed on February 8, 1980, three days after the hearing in this case. Aero maintains that because the Navy's decision not to prepare kits relies ultimately on Lockheed's estimates about how soon kits could be prepared, Lockheed's participation as a defendant is essential in order to afford Aero complete relief.

■ There can be no doubt about the Court's authority to join Lockheed as a defendant, even at this late stage in the proceedings. Rule 21, Fed.R.Civ.P., expressly provides that parties may be added "at any stage of the action and on such terms as are just." The fact that hearings have been completed does not render Aero's motion untimely; district courts frequently have added parties after the trial has been completed. *See, e. g., Hayward v. Clay,* 456 F.Supp. 1156 (D.S.C.1977); *Reichenberg v. Nelson,* 310 F.Supp. 248 (D.Neb.1970).

However, no useful purpose would be served by adding Lockheed as a defendant now. On a number of occasions, most recently at the beginning of the hearing on February 4, the Court inquired of counsel for Aero why it had not joined Lockheed as a defendant. At that time, Aero reiterated that "[o]ur principal beef is with the United States Government . . . not with Lockheed and this is why we chose only the United States Government as the defendant in this case." Transcript of Proceedings, February 4, 1980, at page 5. Nothing has occurred since then to alter the character of this action. While it is true that any subsequent decision the Navy may make regarding the availability of kits will depend in part on schedule estimates provided by Lockheed, those estimates may be reviewed for their reasonableness at a later date. And if evidence is adduced that Lockheed, for whatever reasons, has exaggerated the kit schedule, there will be time enough to add Lockheed as a defendant if it is appropriate and necessary for complete relief. The Court at all times retains power to add a necessary party or to otherwise tailor its judgments in order to afford complete relief to the plaintiff. *See Hayward v. Clay,* 456 F.Supp. at 1161. Accordingly, Aero's motion will be denied without prejudice.

### ORDER AND JUDGMENT

In consideration of the whole record of this case, including affidavits, exhibits, dep-

**570**

ositions, and the record of the hearings held on February 4 and 5, 1980, and for the reasons set forth in the accompanying Memorandum, it is, this 4th day of March, 1980, hereby

ORDERED: That the Navy's motion for summary judgment on Aero's claim for mandamus to compel the issue of its capability to perform SLEP to be submitted to the Small Business Administration for determination is GRANTED; and Aero's motion for summary judgment on the same claim is DENIED; and it is

FURTHER ORDERED: That the Navy's motion for summary judgment is GRANTED in part, in that the Navy's decision to procure SLEP on a sole-source basis for the first twenty (20) C–130's was not unreasonable and was supported by substantial evidence; and it is

FURTHER ORDERED: That Aero's motion for summary judgment is GRANTED in part, in that the Navy acting in good faith but without sufficient attention to its duty to procure competitively, hindered Aero from obtaining, and the GAO and this Court from conducting, adequate review of the Navy's sole-source determination; and it is

FURTHER ORDERED: That the Navy honor the commitment made for it by Captain Neil P. Ferraro in his affidavit filed February 11, 1980; and it is

FURTHER ORDERED: That the Navy will continue in good faith to consider the feasibility of competitive procurement for the remaining planes to undergo SLEP, including the use of kits tailored to depot level contractors experienced with the C–130; and, will closely monitor Lockheed's initial performance to determine whether its original assessment of technical risks and the need for kits remains reasonable; and, should the Navy find it necessary to exercise any option or enter into any new contract with Lockheed prior to the completion of such study, any such contract shall be made terminable upon a finding by the Navy that competition, under practicable conditions, is feasible; and it is

FURTHER ORDERED: That the Navy shall give Aero at least six months written notice of (1) its intention to enter into any new contract for the sole-source procurement of SLEP from Lockheed, or (2) the formation of practically irreversible plans to undertake further SLEP procurement from Lockheed on a sole-source basis; and it is

FURTHER ORDERED: That Aero's motion to add the Lockheed Corporation as a defendant is DENIED without prejudice.

## APPENDIX

COMPTROLLER GENERAL OF THE UNITED STATES
WASHINGTON, D.C. 20548   *attachment*

B-194445.3

December 21, 1979   **FILED**

MAR 4 ꞌꞌꞌ

JAMES F. DAVEY, CLERK

CA 79-2944

The Honorable Edward Hidalgo
The Secretary of the Navy
Washington, D.C.   20350

Dear Mr. Secretary:

Enclosed is a copy of our decision of today, <u>Aero Corporation</u>, B-194445.3.

For the reasons set out in our decision, we have concluded that the Navy properly awarded the contract

to Lockheed on a sole-source basis.   However, we recommend
that the Navy review the sole-source determination before
exercising any option for additional aircraft or awarding
any additional contract to Lockheed.

Sincerely yours,

*Milton J. Socolar*

For the  Comptroller General
of the United States

Enclosure

 **DECISION**   **THE COMPTROLLER GENERAL
OF THE UNITED STATES
WASHINGTON. D.C. 20548**

**FILE:**       B-194445.3        **DATE:** December 21, 1979

**MATTER OF:**   Aero Corporation

**DIGEST:**

1.   Even though protesting firm with considerable
     experience in maintaining C-130 aircraft could
     perform many tasks under contract involving
     replacement of parts to extend service life
     of aircraft with data and tooling available
     under its maintenance contract, procuring
     agency did not act arbitrarily in determining
     that specifications could not be provided to
     achieve competition.  Consequently, determi-
     nation to make sole-source award to original
     manufacturer is not legally objectionable.

2.   Where agency's choice of procurement method
     reflects its own uncertainty as to technical
     risks which may be overcome during contractor's
     performance of work on initial quantity of
     aircraft to be serviced, sole-source deter-
     mination should be reviewed before exercise
     of option for increased quantity or award of
     follow-on contract.

3.   Referral to Small Business Administration for
     Certificate of Competency (COC) is inappro-
     priate where small business was excluded because
     agency was not in position to provide speci-
     fication believed necessary for performance and
     is required to make sole-source award to ori-
     ginal manufacturer in the absence of such

specifications. COC procedure does not affect agency's determination of its technical needs, e.g., the extent to which specifications are considered necessary to reduce risk to acceptable level.

This case concerns the propriety of the Navy's decision to award a sole-source contract for extending the service life of its C-130 aircraft. The Navy believes that the highly complex and technical work required in the circumstances must be performed only by the original aircraft manufacturer, and that award to another firm would involve unacceptable risks. The decision is challenged by a company which has long performed maintenance on the Navy's C-130 fleet and which believes it can do the service life extension work. We find the Navy's position to be reasonable.

The case arises as a protest filed by Aero Corporation of the award of a letter contract to Lockheed-Georgia Corporation (Lockheed) to perform the C-130 aircraft Service Life Extension Program (SLEP). Aero, a current contractor for performance of Standard Depot Level Maintenance (SDLM) for the C-130 aircraft, believes it can perform the life extension work and filed a companion suit for injunctive and declaratory relief in the United States District Court for the District of Columbia (Aero Corporation v. Department of the Navy, Civil Action No. 79-2944).

On November 21, 1979, the Court entered a declaratory judgment for Aero, permitting the Navy to proceed with the award at its own risk while preserving Aero's right to have its complaint decided as though award had not been made. Noting that planning for SLEP had been underway for several years, that the Navy anticipated making a sole-source award to Lockheed for at least four months, and that the Navy was fully aware that a protest or litigation was likely, the court concluded that the Navy in the circumstances had breached a duty to facilitate preaward GAO and court review and to maintain the status quo pending review. Aero's request for a preliminary injunction against award was denied because the first aircraft will not be inducted into SLEP at Lockheed until May 1980, and because the award can be terminated for convenience earlier, if required. However, the court's order enjoined the Navy from inducting any aircraft into SLEP prior to January 1, 1980, and in effect, estops the Navy from asserting post-award status or partial performance as a basis for refusing to terminate the contract, should termination be appropriate. We are deciding this matter because the court has requested our opinion. See 4 C.F.R. 20.10 (1979).

The SLEP program (or more completely, SLEP/CILOP, i.e. Service Life Extension Program/Conversion in Lieu of Procurement) consists of a series of tasks affecting major structural areas of Lockheed-manufactured C-130

aircraft. SLEP is defined by the Navy as "the restoration and/or replacement of primary aircraft structure that has reached [its] fatigue life limit." CILOP involves improving the capabilities of the aircraft. Accomplishment of these objectives, according to the Navy,

> "entails the production and incorporation
> of components/subcomponents into the air-
> frame to the extent of remanufacturing por-
> tions of the airframe structure, such that
> the service life of the aircraft is extended
> by approximately 10,000 flight hours."

The envisioned program anticipates replacing a number of components with parts of current design, and in the case of certain series aircraft, increasing permissible gross weight. SLEP also encompasses several miscellaneous tasks, including upgrading field manuals and related functions, to assure that logistical needs are met.

Three aircraft series are included in the program: the C-130 itself, as well as KC-130s (tankers used primarily by the Marine Corps), and EC-130s. The Navy views SLEP on at least three EC-130s as a matter of immediate urgency due to the role planned for these aircraft which are to be used to provide airborne communications to the Trident fleet under the TACAMO program. The Navy plans to induct these aircraft into SLEP so that special communications equipment will be removed prior to SLEP and replaced upon completion of SLEP. This schedule is considered inflexible because of the limited number of aircraft available and the operational demands of the TACAMO mission.

SLEP as proposed here also includes SDLM. SDLM is defined by the Navy as "rework performed at a military rework facility or commercial contractor's facility at specific intervals during the service life of an aircraft." Normally, SDLM includes a comprehensive inspection of an aircraft, focusing on specific aircraft structures and materials. Critical defects are corrected when found and required preventive maintenance is performed. SDLM routinely includes any other work which must be performed to assure that the aircraft complies with all outstanding technical directives before it is returned to service.

The Lockheed letter contract for SLEP calls for negotiation of a formal contract providing for a modification of 13 aircraft, with an option to increase the total number inducted to 20 aircraft. The Navy proposes to induct 29 additional aircraft under contracts it would award Lockheed in the future. The numbers of various series aircraft are summarized in Table 1.

574

| Series | Number of Aircraft Covered by Letter Contract | Optional Aircraft Covered in Contract | Other Aircraft (Future Contracts) |
|---|---|---|---|
| EC-130 | 3 | 2 | 5 |
| KC-130 | 8 | 5 | 19 |
| C-130 | 2 | - | 5 |
| Total | 13 | 7 | 29 |

Table 1

All of the aircraft listed in Table 1 have met, or are close to meeting, their original 15,000 hour service life limit.

The C-130 SLEP was initiated in 1975. At that time, NAVAIR projected a need for SLEP on 61 aircraft which it expected to perform over a seven-year period, from 1976 through 1982. In 1977 the Navy initiated a study "to assess the current aircraft fuselage and empennage condition [of C-130 aircraft]; determine service life extension requirements and consider appropriate modification, logistics and maintenance alternatives." The Naval Air Rework Facility at Cherry Point (NARF) was designated to manage and staff the project, and in that regard to:

"Conduct an evaluation utilizing all available data * * * to determine cost effective modifications and/or replacement components to provide the desired aircraft service extension. Evaluation shall be conducted on the fuselage and empennage structure and their components * * *."

Lockheed was asked to perform a fuselage and empennage fatigue study. By the fall of 1977, Lockheed had been asked under an existing contract to submit an engineering change proposal (ECP) to identify long lead items which would be needed. In early 1978, the Navy also asked Lockheed to submit an ECP regarding performance of the C-130 SLEP, incorporating the results of its earlier fatigue study and reflecting its own studies of SDLM and other maintenance records. Lockheed did so, eventually preparing two proposals assuming: (1) that all of the work would be performed at Lockheed, and (2) alternatively, that Lockheed would prepare a so-called Military Specification kit (Mil. Spec. kit) for installation of SLEP replacement parts by another contractor.

The record shows that a work requirements specification was developed by the Navy which merely identifies the structural and system components which require replacement to achieve the desired service life extension. The Navy believes the specification is not suit-

able for competitive procurement because it does not describe how the work is to be done, e.g., provide installation procedures (technical directives) and the tools and parts necessary to accomplish the replacements.

Essentially, the Navy contends it would be forced to assume an unacceptable degree of technical risk unless: (1) Lockheed performs the work, or (2) the work is performed by a contractor using a Mil. Spec. kit prepared by Lockheed. It believes that sound practice requires use of a Mil. Spec. kit to assure that the airworthiness of the aircraft is not affected over the proposed extended service life. The Navy believes that it did what it could to compete its requirement. Indeed, in July 1979 NAVAIR had approved a draft procurement plan (the "July plan") which envisioned competition for a portion of the work. As proposed, NAVAIR would have made an initial sole-source award to Lockheed, because: (1) award to Lockheed was the most expeditious means of satisfying SLEP, (2) Lockheed was believed to be the only firm which could satisfy SLEP using a modification program without kits, and (3) Lockheed in any event would have to accomplish non-recurring engineering, manufacture parts, and produce any kits that would be used for competitive procurement. Significantly, the plan provided that kits would be procured to facilitate future modifications by a firm or firms other than Lockheed.

Nevertheless, the Navy says it now has concluded that the kit preparation process cannot be completed in less than four to five years, because the process includes various requirements, including leadtime needed to obtain parts as well as difficulties which concurrent performance of SLEP and Mil. Spec. kit contracts would place on Lockheed's resources. The time required to complete kit preparation and validation of the kits would not permit, in the Navy's view, a SLEP induction and delivery schedule which would meet Navy requirements. (Validation is defined by the Navy as the process by which kits and technical directives are tested for accuracy and adequacy. Essentially, validation entails performance under Navy observation of all required tasks using the materials furnished with a kit.)

Aero has approximately 10 years experience working on Navy C-130 series aircraft as a contractor. During that period it has performed a variety of so-called "over-and-above" work, i.e. work which was required to correct deficiencies discovered in performing SDLM. Pointing out that SDLM contract work has included aircraft modifications as well as crash damage, Aero maintains that it has accomplished at one time or another all but parts of two of the 39 SLEP tasks. It also argues that some of the work it has done was of equal or greater difficulty than is required for the two tasks which it has not completely performed.

Aero believes it does not need kits. In its view, the Navy should have, but failed to, recognize that at least a limited group of experienced SDLM contractors are capable of performing SLEP without kits. Aero says it could be ready to induct the first aircraft six weeks after award to it, that it can perform SLEP within 130 days after each aircraft is inducted, and that it can meet the Navy's projected delivery schedule over the life of the contract.

Indeed, Aero believes it is actually in a better position to perform SLEP than is Lockheed due to its SDLM experience. It can begin performance sooner than can Lockheed, it says, because it does not need to set up tooling, draft planning sheets, and prepare plant space -- tasks it has done in performing related SDLM functions. It states it would accept liquidated damages to guarantee its proposed performance schedule.

In addition to taking exception to the Navy's belief that up to five years is needed to produce kits, Aero states it is willing to serve as the contractor for any kit validation. On June 20, 1979, Aero submitted an unsolicited proposal to perform SLEP based upon Aero's then current understanding of the Navy's plans. Through the proposal Aero offered to perform verification of the technical directives which would be included with kits on three aircraft to perform SLEP/SDLM on 10 additional aircraft, and to perform logistics-related data requirements, developing necessary drawings, engineering notices, technical directive and C-130 manual revisions required.

Aero maintains that it is a small business and that Navy should not procure its requirements without referral to the Small Business Administration (SBA) for a Certificate of Competency (COC). Aero's argument is twofold. It suggests that the rejection of its unsolicited proposal was founded in the Navy's belief that Aero is incapable of performing SLEP and further, that the Navy's decision to "direct" an award to Lockheed was based on its conclusion that only Lockheed is "capable" of performing the work in question.

As provided in 10 U.S.C. § 2304(g) (1976), unless exigency or other special (and here, inapplicable) circumstances require, when a procurement is negotiated:

> "proposals, including price, shall be solic-
> ited from the maximum number of qualified
> sources consistent with the nature and
> requirements of the supplies or services to
> be procured, and written or oral discussions
> shall be conducted with all responsible
> offerors who submit proposals within a com-

petitive range, price, and other factors
considered * * *." (Emphasis added.)

Thus, the question here is whether the Navy, in light of
the statutory preference for maximum practical competition,
had a reasonable basis for directing award to Lockheed
on a sole-source basis.

While presumably no contracting activity will make
a sole-source award in good faith without believing that
the action taken is in the Government's best interest, a
sole-source award may not be justified on that basis or
on the basis that the awardee is the best qualified firm.
Precision Dynamics Corporation, 54 Comp. Gen. 1114 (1975),
75-1 CPD 402. The agency must show that it reasonably
believed that there could be no competition. Control
Data Corporation, 55 Comp. Gen. 1019, 1024 (1976), 76-1
CPD 276; cf. Constantine N. Polites & Co., B-189214,
December 27, 1978, 78-2 CPD 437.

We recognize, as the Navy and Lockheed contend, that
the magnitude of work required at one time with SLEP is
substantially greater than that which is typically required
to perform SDLM on a single airplane. If SLEP involves
completion of some 39 tasks, a resulting 10,000 hour ser-
vice life extension, and an increase gross weight of
affected KC-130F aircraft, it requires, according to
Lockheed, removal of parts totaling 45 percent of the
basic empty weight of the aircraft, replacement of parts
weighing a total of 2,000 pounds, and reassembly of the
remainder (totaling some 32,000 pounds). Although there
is some disagreement as to the exact percentage, the parties
concur that a significant portion of the total effort
will be absorbed by three tasks, involving replacement
of (1) the wheel well side panels in affected aircraft,
(2) the sloping longerons, and (3) the cab frame rein-
forcement doublers.

The parties agree that wheel well side panel replace-
ment is the largest single task, albeit one which does
not apply to the three TACAMO aircraft initially scheduled
for SLEP. These panels -- a structure consisting of num-
erous parts -- carry bearing loads from the fuselage,
wings and landing gear. The task involves removal and
reinstallation of hundreds of parts.

Replacement of the aft fuselage sloping longerons
(two per aircraft) constitutes the second largest opera-
tion. Lockheed anticipates that this will require dis-
connecting the entire aft fuselage structure, involving
removal of approximately 100 parts. It views reassembly
as a critical task, because the fit of the ramp and cargo
door and improper alignment of the aft fuselage structure
affect aerodynamic performance.

Windshield and cab frame doubler replacement, the third significant task, requires removal of outside skins in the cockpit area and careful reassembly to insure against air leaks (the area is pressurized) and windshield cracking over the extended service life.

Lockheed's perception of the work is illustrated by its comment in an early submission to our Office:

"Even assuming Aero's ability to perform these work items, the comparison it has drawn [to SDLM] is inappropriate. This is because of the difference between SDLM and SLEP: in the former, work is done on an as-needed basis, with only a limited amount of structural work being performed at any one time. SLEP, however, is a systematic program whereby all work items are to be done simultaneously, and a majority of the work involves replacement of major structural members. Furthermore, there is a synergistic effect of the SLEP requirement for simultaneous work (i.e., the sum of the parts does not equal the whole because one work task affects the way another task is to be done.) For example, to remove the sloping longerons in SDLM, a rather simple support system is all that is needed to hold the aircraft stable. In SLEP, however, because of the other work being performed at the same time, a far more complex support system must be used."

Viewing SLEP as addressing aircraft structure as an integrated whole, Lockheed argues that SLEP can be completed successfully only if proper physical support, location tooling and methodology is used -- capabilities which it asserts are available only if the work is done by the original manufacturer. Location tooling refers to jigs and other devices used to position parts during assembly to assure that they are properly aligned.

Specifically, Lockheed focuses on three wheel well replacement related tasks and four additional work items (two related to the longeron and windshield doubler replacement tasks and two others) which it believes are critical, requiring use of location tooling if tolerances and interchangeability of parts and assemblies are to be maintained. These are as follows:

1. The wheel well side panels must be installed to tolerances of 0.030 inches (approximately 1/32 of an inch). Otherwise, at minimum, the main landing gear operation may be disrupted or excessive stress placed on components of the panel or adjoining structure.

2.  Installation of so-called "porkchop fittings" (furnished as blank parts and mated together at the fuselage floor) and related wheel well attachments must be held in proper position to assure that excessive loads are not imposed.

3.  Installation of wheel well beams (on EC-130 aircraft only) which support the landing gear tracks must be held to an accuracy of 0.25 degrees vertically and 0.005 degrees laterally to assure proper operation.

4.  Lockheed sees installation of the longeron end fitting as critical because it not only controls the position of the sloping longeron but also affects the horizontal stabilizer attach fittings. Unless the position and hold dimensions of the vertical stabilizer attach fittings are maintained, the stabilizer will not match the aft fuselage fittings. (Lockheed admits that it does not have the tool required to assure that this match will be maintained, but intends to borrow it from a subcontractor.)

5.  Accuracy of installation of the longerons is considered critical, as indicated, to assure interchangeability of the aft cargo door attachment and ramp.

6.  Lockheed also points out that windshield and column frame openings must be held to prescribed dimensions to insure interchangeability of window and windshield components.

7.  Likewise, Lockheed notes, replacement of two of the nacelle engine truss mounts is critical to assure interchangeability of other parts.

On the other hand, even the Navy recognizes that the difference between SDLM and SLEP is in part one of degree, as indicated in the deposition taken of Navy Captain Russell E. Davis, the Program Manager for SLEP:

"Q. * * * Is it correct that for a SDLM contract, the contractor inspects the airplane? He then makes a determination or a judgment as to what portions or parts of the airplane need to be replaced.

"He confers possibly with Navy representatives on the question of whether replacement is in order. An agreement is reached as to whether the part ought to be replaced. When that agreement is reached, then the contractor proceeds to make the replacement and he does that for every part that agreement has been reached upon.

"Then the aircraft is completed. You have a flight inspection and the SDLM task is performed for that particular aircraft. * * *

"A. That is a fair description. However, I would like to believe that a tooling requirement determination is made somewhere in the evaluation process, either as a recommendation by the SDLM contractor or as a determination by DCAS and the Navy engineers, and in some cases I believe that tooling is required on an extra order basis for SDLM contractors.

"Q. So SDLM contractors have a certain amount of tooling available to do these replacement tasks?

"A. You have a depot level outfit for tooling.

"Q. Assume that is a C-130 aircraft that comes into the SDLM contractor's plant. The inspection is done and for each and every [item] identified in the SLEP work statement, there is a deficiency found * * *.

"A. If he were to replace all of the parts at that particular time in whatever sequence is deemed appropriate by either his engineering group or the Navy engineers and the appropriate tooling is there to do the job and the quality assurance folks buy off on it and the airplane flies, then I think you could probably assume that a like operation to SLEP will [have been] done on that airplane."

This close relationship between SDLM and SLEP is also indicated by the Assistant Deputy Chief of Naval Material's memorandum approving the final procurement plan. At that time he directed that:

."C-130 series aircraft scheduled for SLEP * * * at Lockheed will be considered for induction at the then current SDLM contractor's facility in the event a substantial delay occurs in the scheduled SLEP [if] a SDLM is determined [to be] necessary to sustain the material condition of the aircraft."

The significance of this statement is disclosed by the deposition of Mr. Herman, the C-130 project engineer at Naval Air Research Facility, and OPNAV Instruction 3110.11M regarding "policies and peacetime planning factors governing the use of naval aircraft." The Navy admits that most if not all aircraft which reach the end of their original service life are not taken out of service permanently. Rather, the Navy has various procedures, including SDLM, to keep them in service, albeit possibly with increased operating cost and downtime.

Also, Aero does not agree that the magnitude of the total job is quite what Lockheed sets out. As explained by Aero, "The need for * * * simultaneous replacement of all SLEP items is the lynchpin of the Navy's argument that only Lockheed is currently able to perform the SLEP tasks." However, Aero states that it:

"* * * will not perform the SLEP tasks 'simultaneously,' as Lockheed proposes to do. Aero will perform the SLEP tasks in a sequenced group of tasks as it presently performs SDLM, and Aero has all of the tools available to do so. Moreover, Aero has the required technical directives or work instructions for 37 of the 39 tasks and the capability to develop this data for the remaining two tasks."

In Aero's view, Lockheed's "simultaneous" approach is neither required nor desirable. Indeed, Aero views its sequential approach as superior because "it permits the aircraft to be [used as] its own master tool and eliminates the dangers of structural impairment and [residual] stress" which it argues otherwise would be a problem even if Lockheed's approach were used. Aero's proposed technique involves making the parts fit by finishing them in place, e.g., by "backdrilling" holes using adjacent parts as guides. It argues, and Lockheed concedes, that aircraft which have been flown 15,000 hours have been subjected to stresses in flight and on landing that affect the alignment of parts throughout the airframe. The Navy assumes that every one of the affected aircraft has been operated beyond designed gross load limits. This means, Aero explains, that use of original tooling to "force" parts to conform to original manufacturing tolerances of itself introduces residual stresses and potential damage.

For just the same reasons, Lockheed characterizes the aircraft as an inaccurate locating tool, claiming that backdrilling techniques cannot replace proper location tooling in SLEP because the accuracy and precision obtained using such methods "can be no greater than that of the existing parts and holes." It emphasizes that:

"Where such parts and holes are deformed or out of alignment due to stress and wear, previous maintenance and repair work, or the process of dissembly, they will definitely not provide reliable guides or templates for the sort of work required by SLEP. The age and condition of the aircraft in question, as well as their broad exposure to several generations of depot level maintenance and repair work * * * strongly suggest the

imprudence of using the backdrilling expedient in SLEP."

It seems clear from the preceding that the Navy believed that there was significant risk involved if a firm other than Lockheed was to perform the work. The record shows, however, some disagreement among responsible Navy personnel regarding the extent of that risk and the course which should be pursued as a result. NAVAIR contracting personnel believed that competition could be introduced, while throughout, Lockheed was favored by NARF personnel and others.

The minutes of the NAVAIR September 28, 1979 meeting approving sole-source procurement reflect this dichotomy of views:

"In recommending [sole-source to Lockheed], [Captain] Davis pointed out that it is the most responsive to Fleet needs and had the lowest cost, technical, and schedule risks, although it does preclude competition. * * * [Captain] C.M. Rigsbee, AIR-03, felt that NAVAIR should make a hard decision as to which option best serves the Navy's needs regardless of any potential protests. [Captain] N.P. Ferraro recommended that we get a firmer hold on the impact a competitive procurement with its prolonged schedule may have on the Fleet. [Rear Admiral] L.R. Sarosdy, AIR-04, and [Captain] W.J. Finnernan, AIR-05A, agreed that the prime contractor was the only plausible place to perform the SLEP, even if other contractors had installation kits."

As indicated earlier, the Navy considered the use of kits in order to have a competitive procurement and while it found the kits to be an acceptable approach, it also determined that the time frame involved for development and validation of the kits was unacceptable.

We find that the Navy had a reasonable basis for its belief that award to any firm other than Lockheed would involve unacceptable risk, even though we believe the Navy's reluctance may result in part from its inability to assess fully the risks taken.

First, as indicated above, there are significant differences between SLEP and SDLM and the risks involved in each. Although we are convinced that there are good faith differences of opinion regarding the amount of risk, nevertheless we find no abuse of discretion regarding the Navy's higher estimation of the risk in SLEP. Obviously, it is reasonable to expect greater risks in achieving the desired 10,000 hour service life extension for SLEP as opposed to the 3,000 hour extension obtained by SDLM,

particularly in view of the greater structural work which Navy categorizes as a remanufacturing process.

Second, we are not convinced that SLEP can be performed without some form of kit. Even though Aero has performed most of the tasks during SDLM, its methodology envisions less dissembling of the aircraft using more of the aircraft as its own locating tool. Lockheed, on the other hand, would provide more dissembling of the aircraft and use original manufacturer's tooling. While we believe SLEP might be performed using something less then a Mil. Spec. kit, we are not persuaded that the work can be accomplished entirely as Aero envisions. It is likely, in our opinion, that some "backdrilling" of holes using adjacent parts as guides, as proposed by Aero, would not be acceptable and that use of specialized tooling may be required where original manufacturing tolerances are considered necessary. Moreover, it is logical for the Navy to want to maintain greater control of the remanufacturing process it envisions so as to insure the higher quality of workmanship considered necessary for SLEP but not required for SDLM.

Third, we are aware of no legal requirement for the Navy to provide kits specially tailored to a limited group of maintenance contractors, such as Aero, regardless of whether Navy could have or should have arranged for kits earlier. The Navy is required to seek competition where it can find it. However, in our opinion, the statutory preference for maximum practical competition is not disregarded where, as here, consideration is given to the feasibility of providing Mil. Spec. kits to facilitate competition on a broader basis which included maintenance contractors.

The question remaining is whether the Navy reasonably concluded that the development of kits is not feasible in the time frame for performing SLEP. In this connection, Aero argues that the development of kits does not require five years primarily because it believes kits covering all 39 SLEP tasks are unnecessary, having accomplished replacement of parts during SDLM for 37 out of the 39 SLEP tasks. Moreover, Aero argues, the Navy should exercise its discretion to cut short the kit preparation process, e.g., by waiving the trial and validation phases. As explained above, we believe the Navy has not abused its discretion by seeking to control SLEP performance by firms other than the original manufacturer by requiring performance in accordance with Mil. Spec. kits. We base this conclusion on the Navy's efforts to obtain competition using kits, and on its uncertainty as to how technical risk otherwise should be contained, even though many of the tasks previously may have been performed by others during SDLM. Similarly, whether certain phases of the kit preparation process can be cut short or condensed

is largely discretionary with the Navy and because of the technical risks involved we are not in a position to take issue with what may be the Navy's conservative views in this regard.

Aero also argues that the projected operating service life of the C-130 aircraft does not preclude competition because it is merely a projection of the minimum expected service life and the Navy has in fact extended the operating service life of a number of C-130 aircraft. However, as indicated above, the Navy has not sought to justify its sole-source award to Lockheed because of exigency precisely because it cannot certify that aircraft will be grounded after a predetermined number of hours without inspection.

Moreover, we disagree with Aero that the record is inadequate to support Lockheed's time frame for furnishing Mil. Spec. kits and the Navy's conclusion that the kits cannot be designed, developed and produced in the required time frame. The Air Force Plant Representative Office at Lockheed was requested to evaluate Lockheed's schedules based on first hand knowledge of Lockheed's capabilities and performance on similar programs. Apparently, aerospace contractors are experiencing substantial increases in material leadtime and the Air Force plant representative considers Lockheed's schedules to be realistic, although somewhat conservative.

Nevertheless, it is possible that initial SLEP experience will allay much of the Navy's concern. Consequently, we believe, the Navy should continue to evaluate the necessity for the course of action chosen and in this regard: (1) should include in any contract with Lockheed provisions which will afford the Government access to technical data which it may find necessary, and (2) should closely monitor Lockheed's initial performance and evaluate the methods used to determine whether an experienced maintenance contractor's performance would be acceptable. We recommend that the Navy review the sole-source determination before exercising any option or awarding a follow-on contract for all or part of the 29 remaining aircraft to Lockheed.

We conclude that a limited award to Lockheed on a sole-source basis is justified in the circumstances. Aero necessarily has been excluded from competing for this requirement because the Navy, in determining its technical requirements, refused to permit firms other than the original manufacturer to perform SLEP without Mil. Spec. kits. In these circumstances Aero had no basis for insisting that Navy must first refer the question of Aero's competency to perform SLEP without Mil. Spec. kits to the SBA for certification. The COC procedure does not affect a procuring agency's determination of what are

its technical requirements, <u>e.g.</u>, the extent to which specifications are considered necessary to reduce risk to an acceptable level. The COC procedure is inappropriate where an agency is not in a position to provide specifications believed necessary for performance and is required to make sole-source award to the original manufacturer. <u>Applied Devices Corporation</u>, B-187902, May 24, 1977, 77-1 CPD 362.

The protest therefore is denied.