**DELTA DATA SYSTEMS CORPORATION, Plaintiff,**

v.

**William H. WEBSTER, et al., Defendants.**

**Civ. A. No. 83–3051.**

United States District Court, District of Columbia.

June 8, 1984.

Paul G. Dembling, Thomas Earl Patton, Sharon V. Freed, Schnader, Harrison, Segal & Lewis, Washington, D.C., for plaintiff.

Stuart H. Newberger, Asst. U.S. Atty., Washington, D.C., for defendants.

William H. Butterfield, Boothe, Prichard & Dudley, Washington, D.C., for intervenor System Development Corp.

## OPINION

HAROLD H. GREENE, District Judge.

Plaintiff Delta Data brought this action to enjoin the Federal Bureau of Investigation's award of a contract for Tempest-qualified [1] computer terminals and related equipment to Systems Development Corporation, a subsidiary of Burroughs Corporation (Burroughs), pursuant to Solicitation No. 2591. On December 19, 1983, the Court denied plaintiff's motion for a preliminary injunction,[2] and it also denied the government's motion for summary judgment on the issue of the legality of the FBI's consideration of the financial soundness of Delta Data. See *infra*. The parties were given time in which to conduct further discovery on the question whether

---

1. "Tempest-qualified" denotes a technological development by which computer hardware is internally immunized from external electronic surveillance—*e.g.*, wiretaps or "bugs."

2. At a hearing on October 18, 1983, the Court had also denied plaintiff's motion for a temporary restraining order.

it is a practice in government procurement in general, and in FBI procurement in particular, to reexamine the financial soundness of offerors at the technical evaluation stage. After conducting such discovery, the parties filed cross-motions for summary judgment.

During the interim, plaintiff also filed a formal bid protest with the General Accounting Office (GAO).[3] On April 17, 1984, the Comptroller General rendered a decision on behalf of the GAO, sustaining Delta Data's protest and recommending to the Court that the FBI be required to terminate the Burroughs contract and to award it instead to Delta Data as the offeror with the highest overall evaluation. The Comptroller General found that the FBI was not justified in conducting a comparative evaluation of the offerors' finances or in treating their financial condition as a technical evaluation factor. It further found that "both the solicitation language and the FBI's course of conduct throughout the procurement were consistent only with this factor's being treated as a matter of responsibility. Consequently, Delta Data had no notice of the FBI's concerns or an opportunity to explain or cure its condition during negotiations." Decision at 7.

Following the issuance of that decision, both parties filed supplemental memoranda in support of their respective motions for summary judgment. In addition, Burroughs filed a motion to intervene as a party defendant, which the Court granted on May 14, 1984. A hearing on all the motions was held on May 30, 1984, and the following day,[4] for the reasons given below, the Court granted plaintiff's motion for summary judgment, and it ordered the FBI to terminate its existing contract with Burroughs and to award the contract instead to Delta Data.

I

The material facts are not in dispute. On September 13, 1982, the FBI issued solicitation 2591 for the supply of Tempest-qualified computer terminals, printers, and discs over an eight-year period. The Request for Proposals (RFP) provided that the award would be made to the offeror with the highest total evaluated score based upon four weighted factors: (1) cost (55%); (2) vendor considerations (20%); (3) live test demonstrations (15%); and (4) desirable features (10%). The RFP broke down each of these factors into subfactors, it set forth in detail the scoring methodology to be applied with respect to each factor, and it described how the FBI would determine each offeror's total score. Neither the financial condition of the offerors nor any other form of financial consideration was listed as an evaluation criterion.

On May 2, 1983, the FBI received initial offers from four offerors. One of these was immediately deemed to be technically unresponsive, and the FBI conducted live test demonstrations of the equipment offered by the other three—Delta Data, Burroughs, and IBM—in July and August of 1983. On August 31, 1983 the FBI's Technical Evaluation Committee met to evaluate the offerors' vendor considerations[5] and to determine technical rankings.[6] The Committee assumed that each of the three offerors was financially sound. Indeed, although no specific responsibility determination had been made,[7] the FBI has since acknowledged to the GAO that Delta Data

---

**3.** In its December 19, 1983 Memorandum, the Court stated that it would consider any decision rendered by the GAO.

**4.** The Court issued its Order on May 31, 1984, because at the hearing it was advised that the FBI and Burroughs planned to resume performance under the contract on June 1, 1984. Performance had been interrupted following the issuance of the GAO decision.

**5.** The vendor considerations criterion consists of five subcriteria: (1) past performance; (2)

soundness of approach (*i.e.,* risk factor); (3) operational reliability; (4) vendor support; and (5) technological evolution.

**6.** George Hawkins, the Chairman of the Technical Evaluation Committee, stated that at the time of the August 31, 1983 evaluation, he did not contemplate any further technical evaluations.

**7.** The technical procurement regulations require the contracting officer, in making a responsibility determination, to determine whether a pro-

met the financial responsibility requirements to perform the contract.[8]

As a result of the Committee's August 31, 1983 evaluation, Delta Data was ranked first with 20 out of 20 points for vendor considerations, Burroughs ranked second with 18.0723 points, and IBM third with 7.7547 points. These rankings, as well as the findings regarding the other criteria, were submitted to the FBI contracting officer on September 1, 1983.

Because of minor technical concerns, the FBI requested a second round of best and final offers on September 13, 1983.[9] Thereafter, the FBI requested Dun & Bradstreet to prepare a report on Delta Data and Burroughs. In response, Dun & Bradstreet reported that Burroughs had a rating of 5AO, its second highest rating, but that it would not rate Delta Data because that company was in an "unbalanced condition as of 8–83."[10] The FBI requested and received limited additional financial information from Delta Data, but the agency did not seek an explanation from that company with respect to the matters causing it

concern.[11] Instead, the Committee simply reconvened to reevaluate Delta Data's vendor considerations in light of the financial information; it lowered Delta Data's score; and it moved Burroughs into first place.[12] Taking into account cost considerations, Burroughs now received a score of 92.96, Delta Data a score of 90.71.[13] The contracting officer accordingly recommended that the FBI award the contract to Burroughs, and this recommendation was approved by the FBI's Contract Review Board.

There is no dispute that, if the FBI had not conducted a comparative evaluation of the relative financial strength of the offerors, Delta Data would have received the highest overall score and would have been the winning offeror.[14] Thus, the question before the Court is whether such a financial evaluation as part of the technical vendor consideration criteria is lawful.

## II

The scope of judicial review in a disappointed bidder case is limited. The

---

spective contractor has adequate financial resources, or the ability to obtain such resources as required during performance of the contract. 41 C.F.R. § 1–1.1203–1(a).

8. FBI letter of February 13, 1984 to GAO. Delta Data notes that, given its record as a major supplier of Tempest-qualified equipment to the federal government and the fact that it had major financial backers, no other finding was possible.

9. These concerns appear to have related to questions of quantity and spare parts. There is no indication that the rankings changed as a result of the second round.

10. The phrase "unbalanced condition" was not defined or explained.

11. A certified public accountant employed by the FBI, who conducted a brief, perfunctory examination, reported that Delta Data (1) was in default to preferred shareholders; (2) had furnished the FBI with an unaudited financial statement; (3) was in the process of renegotiating long term debts to meet current obligations; and (4) had made sizable loans to its corporate officers at low or no interest for stock purchases.

It appears that most of this information was in error. Indeed, in its papers filed with this

Court, Delta Data has alleged facts and supplied significant information which refute the adverse financial findings. The chairman of the Technical Evaluation Committee has testified that had some of this favorable information been available to the Committee, it would have considered it in evaluating Delta Data's financial condition and in assessing its effect on Delta Data's ability to perform the contract.

12. The scores of the two offerors were as follows:

|  | First Evaluation (August 31, 1983) | | Second Evaluation (September 26, 1983) | |
|---|---|---|---|---|
|  | Burroughs | Delta Data | Burroughs | Delta Data |
| Vendor Considerations | 18.0723 | 20.000 | 20.000 | 11.1273 |
| Live Test Demonstrations | 14.0798 | 14.8552 | 14.0789 | 14.8552 |
| Desirable Features | 10.0000 | 9.7211 | 10.000 | 9.7211 |
| TOTAL | 42.1512 | 44.5763 | 44.0789 | 35.7036 |

13. The evaluated cost for Burroughs and Delta Data were $32,715,272 and $29,060,693, respectively.

14. Before the August 31, 1983 evaluation, Delta Data had a total evaluated score of 99.5 points; Burroughs had a score of only 91 points.

Court must restrict its inquiry to a determination whether the procurement agency's decision had a rational basis. *M. Steinthal and Co. v. Seamans,* 455 F.2d 1289, 1301, 1306 (D.C.Cir.1971); *Aero Corp. v. Department of the Navy,* 493 F.Supp. 558, 566. (D.D.C.1981). In order to prevail, a plaintiff must show that either the procurement official's decision on matters committed primarily to his discretion had no rational basis, or that the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulation. *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973).

■ It is also well established that a reviewing court must accord significant deference to the findings and conclusions of the GAO, the agency with special competence and experience in procurement regulation. *Wheelabrator Corp. v. Chafee,* 455 F.2d 1306, 1316 (D.C.Cir.1971) (court may defer to GAO under primary jurisdiction doctrine because of that agency's special competence in government procurement); *M. Steinthal & Co. v. Seamans, supra* (court may properly take into account concurrence of GAO, an agency with unique experience and a tradition of care and objectivity); *A.G. Schoonmaker Co. v. Resor,* 445 F.2d 726, 728 (D.C.Cir.1971) (District Court reversed because it failed to follow GAO decision which was not arbitrary or

capricious); *Ocean Electric Corp. v. Laird,* 473 F.2d 154, 155 (D.C.Cir.1972) (reasonable decision of GAO should not be disturbed by the courts); *Aero Corp. v. Department of the Navy, supra* (GAO conclusions not to be overturned unless arbitrary and capricious).[15]

The GAO's decision in this case had three aspects.

First. The GAO held that an offeror's financial condition is solely a matter of responsibility as distinguished from being a subject of comparative evaluation among all the offerors.[16] That is so because responsibility determinations are made for the sole purpose of determining whether a particular offeror has the capacity to perform the contract work. Evaluation criteria, on the other hand, are used to make relative assessments of the technical merits of the several proposals.[17]

Second. The GAO decided next that the use of financial condition as a technical evaluation criterion is improper unless it is disclosed to the offerors in the RFP. Here, both the solicitation language and the FBI's course of conduct during the procurement process indicated that the FBI would treat the offerors' financial condition as nothing other than a matter of responsibility. Even when the FBI finally requested financial information concerning Delta

---

**15.** The government argues that the Court should decline to follow the GAO decision because it conducted a *de novo* review of the entire procurement process, substituted its own judgment for that of the FBI, and shifted the burden of proof from Delta Data to the FBI. These arguments lack merit. The GAO concluded that plaintiff had met its burden of establishing that the FBI's comparative evaluation of the offerors' finances had no rational basis and violated federal procurement regulations. In that context, the GAO's statement that "we do not believe that the FBI has justified its comparative evaluation of the offerors' finances in this case" indicates only that the government was unable successfully to rebut the plaintiff's case. See also note 20 *infra.*

**16.** The GAO exempted special circumstances not present in this case.

**17.** The GAO noted that procuring agencies may consider certain responsibility-related factors when evaluating proposals but such factors are

generally limited to such areas as experience, available facilities, and personnel qualifications—none of which is relevant here.

The GAO rejected the FBI's contention that an offeror's financial condition is inherent in the technical evaluation under the vendor considerations stating that

Although we recognize that an offeror's ability to obtain financing arguably affects its ability to satisfy these criteria, and perhaps every other aspect of performance for that matter, the consideration of an offeror's finances and how they affect its ability to perform the contract is what a determination of responsibility concerns. Thus, the inherency argument is simply another way of expressing the fundamental rationale for reviewing an offeror's responsibility, and is not a justification for avoiding that review.

Decision at 6.

Data and Burroughs, it did so for the purpose of determining financial responsibility, not for making a further comparative evaluation. Yet what the FBI ultimately did was to conduct a comparative evaluation of the offerors' financial condition.

Third. The GAO found that the FBI compounded the error when it provided no notice to Delta Data of the FBI's concern and gave that company no opportunity to explain [18] or, if necessary, to cure its condition.[19]

Not only does the GAO decision have a rational basis, but the Court is in complete agreement with that agency's conclusions concerning the lawfulness of the FBI's actions.[20]

An offeror's financial condition is relevant only in determining whether it satisfies the threshold requirements of financial responsibility. It has nothing to do with technical evaluation factors. Consideration of this factor as part of technical vendor considerations is irrational—either an offeror is financially responsible to perform a contract or it is not. Moreover, such a comparative evaluation has the effect of giving larger firms an inherent advantage in the procurement process, for almost invariably on a comparative basis they will have a financial advantage over smaller firms.

Beyond that, when presented with the Dun & Bradstreet report—or more accurately, that company's refusal to rate Delta Data—the FBI had three possible choices: (1) it could determine that Delta Data was not financially responsible;[21] (2) it could determine that Delta Data was financially responsible; or (3) if it was unable to make a responsibility determination on the basis of the information before it, it could request additional information or studies. The FBI did none of these, but it decided instead to use the information concerning Delta Data's financial condition as a comparative evaluation factor, and it did so, moreover, on the basis of incomplete information and without notice to Delta Data.[22]

■ In short, it is clear that the FBI's comparative evaluation of the offerors' financial condition violated federal procurement law and had no rational basis.[23]

### III

■ What remains to be decided is what relief is appropriate. The FBI argues that, notwithstanding the finding of the Court and the Comptroller General that the award has no rational basis and is contrary

18. Delta Data would have been able to explain. See note 11 *supra*.

19. The GAO noted that, had the FBI found that Delta Data was not responsible, the matter would have had to be referred to the Small Business Administration under 15 U.S.C. § 637(b)(7)(A) for a final determination.

20. Defendants complain that the GAO somehow provided the Court with information that differed from what the Court required. That is entirely incorrect. From the very outset of this case, the Court was concerned that the FBI might have used financial responsibility factors as the decisive element in what was properly only a technical evaluation phase. Not being expert in procurement procedure, the Court decided that it needed further information, and it therefore requested the parties to take discovery on general procurement practice in government and in the FBI in that regard. The conclusion of the GAO—*the* expert in this field—provided the Court with precisely the information it required.

21. In which case, the matter of Delta Data's financial responsibility would have had to be referred to the Small Business Administration for final determination. See note 19, *supra*.

22. See note 11 *supra*. Delta Data states that because it believed that the FBI would use the financial information it furnished only to verify its financial condition, it provided only the information necessary to show that it was responsible.

23. The government and Burroughs argue that, even if the FBI's comparative evaluation of the offerors' financial conditions was improper and Delta Data was, in fact, entitled to its previous, higher technical evaluation score, the FBI could reasonably decide to award the contract to Burroughs for other reasons, *e.g.*, because its actual contract price was less than Delta Data's. But the FBI did not consider other, legitimate factors and award the contract on that basis. Instead, it took into account an entirely improper factor and on that basis—and that basis alone—it awarded the contract to Burroughs.

to law, injunctive relief should not be granted because of overriding public interest considerations. In this respect, the government alleges that substantial performance has already taken place, including delivery and installation of terminals; substantial amounts have been expended and more monies, including termination costs, are obligated to be expended in connection with the contract; and cancellation of the contract would disrupt the FBI's important operations.[24]

First. The government vastly overstates its financial injury from the termination of the contract. Thus, the FBI claims that it has already spent over $4 million under its contract with Burroughs, and it estimates that it would cost the agency an additional $10 million to terminate the contract. However, some or much of the Burroughs equipment delivered to the FBI is fully compatible with Delta Data's equipment and can be incorporated into the system to be installed by Delta Data, with a deduction in its contract price and at little or no loss either to the FBI or to Burroughs.

More important, whatever equipment Burroughs has delivered thus far is non-Tempest (see note 1 *supra*). As such, it is due to be replaced next month by Tempest equipment even if Burroughs remained as the contractor.[25] Since Burroughs had thus presumably always planned to take back its non-Tempest equipment, it must have also anticipated reselling it to others, and neither it nor the government will suffer substantial loss with respect thereto.

Finally, the government took a calculated risk with respect to whatever additional expenses might be incurred. At the hearing on Delta Data's request for a temporary restraining order, the Court admonished the government to act prudently with respect to performance under the contract because an injunction was likely to be entered if the Court verified that the FBI's procedure in this case was incompatible with procurement law. The government was clearly on notice that interim expenditures of funds pursuant to its contract with Burroughs would be at its own risk and would not be considered by the Court should Delta Data ultimately prevail on the merits.[26] The government nevertheless went heedlessly ahead, and the Court will not hear its present request for relief from a problem of its own making.

Second. It is likewise untrue that cancellation of the contract would seriously disrupt either the FBI's daily operations or its long-range plans.

The contract in question is not designed for or tailored to the events of the next few weeks or months, as the FBI would have the Court believe. This is an eight-year contract, delivery to begin sixty days after the award. Moreover, there were lengthy delays in the award of the contract—from September 1982 to September 1983—again indicating that there was no immediate urgency. Finally, only ten percent of the terminals have been delivered by Burroughs and, as noted, these terminals do not even conform to the contract requirements; they are not secure. Delta Data states that it is ready, willing, and able to begin delivery of the proper, Tempest-qualified, secure equipment at a rate of 300 terminals per month beginning next month—the same time that Burroughs is scheduled to begin substituting such equipment for its non-conforming equipment

---

**24.** More specifically, the government states that the computer system has been used to support such investigations and prosecutions as the murder of Judge John H. Wood, Abscam, the attempted assassination of President Reagan, and various terrorist incidents. It is also claimed that the system is being prepared to provide support in case of problems at the upcoming Los Angeles Olympic Games, the national political conventions, and the World's Fair in New Orleans.

**25.** As indicated above, only Tempest equipment conforms to the solicitation requirements because only Tempest equipment is immune from penetration by electronic eavesdropping.

**26.** Transcript of hearing on October 18, 1983 at 28.

presently in place. In view of those facts, the government's *in terrorem* claim that this particular equipment is—and presumably always has been—needed to cope with emergencies which may occur during the next two months is entirely unpersuasive.

It should also be noted that Delta Data had offered to meet with the FBI to discuss the case of converting from Burroughs equipment to Delta Data equipment, and that it had also offered to furnish the FBI with data establishing its readiness to perform the contract with minimal disruptions. The FBI, however, has refused to confer with Delta Data for either of these purposes.[27] Here again, the government had the opportunity to minimize problems, but it again refused to do so.

Third. Injunctive relief will preserve the integrity of the federal procurement process by preventing the continued performance of a contract in contravention of law, the procurement regulations, and the decision of the Comptroller General, and by shutting out entirely the company lawfully entitled to the contract.

The Court finds that the injury suffered by Delta Data as a result of the FBI's improper award to Burroughs is irreparable, and that a damages remedy compensating Delta Data for its bid preparation costs would be inadequate. See *General Electric Co. v. Seamans*, 340 F.Supp. 636, 640 (D.D.C.1972). Moreover, an injunction will not substantially harm other interested parties [28] and, for the reasons stated above, it is in the public interest. Accordingly, the FBI is permanently enjoined from proceeding with its contract with Burroughs, and it is ordered to award the contract instead to Delta Data.

**27.** In the face of the injunction issued by this Court, the FBI still refuses to meet with Delta Data.

**28.** Burroughs argues that because it took no part in the actions that the Court finds were arbitrary, capricious, and contrary to law, it will be unfairly penalized if the Court orders the FBI to award the contract to Delta Data. If this were the test, an unlawfully awarded contract

could never be enjoined. Burroughs was, of course, never entitled to the contract award in the first instance. Moreover, under the regulations, it will be able to recover certain of its costs. Any injury suffered by Burroughs as a result of the FBI's termination of its contract is *de minimus* compared to the injury that Delta Data would suffer if an injunction were not issued.