**AERO CORPORATION, Plaintiff,**

v.

**DEPARTMENT OF THE NAVY,
Defendant.**

Civ. A. No. 79–2944.

United States District Court,
District of Columbia.

July 8, 1982.

**40**

See also, D.C., 540 F.Supp. 180.

Roger N. Boyd, Jean-Pierre Swennen, Frederick W. Claybrook, Jr., Washington, D.C., for plaintiff.

Charles F.C. Ruff, U.S. Atty., Royce C. Lamberth, Kenneth M. Raisler, with Barbara McBride, Asst. U.S. Attys., Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

In this protracted litigation plaintiff seeks relief from defendant's decision to award contracts for the Service Life Extension Program ("SLEP") designed for 49 C–130 aircraft to Lockheed-Georgia Corporation ("LGC") without competition open to plaintiff and other experienced military aircraft overhaul contractors. The challenged procurement of SLEP for defendant's C–130 fleet, which began before 1979, will extend into 1985.

The challenged procurement has been the subject of several opinions by the Acting Comptroller-General, and several motions for preliminary injunctions seeking various remedies for defendant's alleged violation of the Armed Services Procurement Act, 10 U.S.C. §§ 2301–2314, and Section 3 of the Armed Services Procurement Regulations ("DAR"), see 32 C.F.R. parts 1–39 (vol. 1). A Memorandum filed February 18, 1982, 540 F.Supp. 180, concluded that plaintiff would probably prevail on its claim that the sole-source procurement from LGC of SLEP for all 49 aircraft violated 10 U.S.C. § 2304(g) and DAR § 3–101(d), which impose on military procurement agencies strict duties to pursue and obtain all feasible competition for most contracts in excess of $10,000.[1] The February 1982 Memorandum concurred in the Acting Comptroller-General's earlier opinion that defendant had never advanced a rational basis for its extraordinary decisions to avoid any competition of this SLEP undertaking. An accompanying Order enjoined defendant to commence forthwith the preparation of the technical documents required to determine

1. *Aero Corp. v. Department of the Navy*, 540 F.Supp. 180 (D.D.C., 1982).

whether competition of any aircraft in the group of 49 was still feasible and prudent and to begin preparation of any Engineering Change Proposal ("ECP") and Air Frame Change ("AFC") document it needed for SLEP accomplishment by firms already having extensive technical experience in overhaul of the C–130. To maintain a *status quo* that would permit competitive award of even a few SLEP contracts to a firm like plaintiff, the Order also directed defendant to take all other steps it believed necessary for a competitive procurement of SLEP, including, but not limited to, procurement of parts needed for SLEP of aircraft under NAVAIR's current schedule. The Order left to defendant the task of reaching and rationalizing its own reviewable conclusion as to whether competition for some of the designed C–130 fleet was feasible and fiscally prudent.

Defendant has now reported the results of its study, and the matter is before the Court on plaintiff's renewed application for further affirmative relief.[2] Plaintiff contends that defendant's purported study of competitive possibilities for SLEP accomplishment is technically defective, irrational, and wholly unresponsive to the requirements of the procurement statutes, regulations, the opinions of the Comptroller-General and the Orders of this Court. Still under advisement from earlier stages of the litigation are plaintiff's prayers for final and plenary relief which would include a permanent injunction to require competition of these SLEP contracts, as well as plaintiff's motions for an order holding defendant in contempt for willful noncompliance with prior Orders of this Court and for attorneys' fees.[3]

### I.

Based upon its study conducted since issuance of the Order of February 18, 1982, defendant has decided to adhere to its earlier conclusion that the law requires no competition of any of its scheduled SLEP contracts for the C–130 fleet. That decision is evidenced by the affidavit of Bruce D. Nordwall, defendant's Program Manager for the C–130 SLEP undertaking. The relevant portion of Capt. Nordwall's affidavit reads as follows:

> . . . In accordance with the Preliminary Injunction entered by the Court on 18 February 1982, the Navy has determined that competition for SLEP installation on the C–130 series aircraft remaining in the SLEP program, limited as described in the Preliminary Injunction, is neither feasible nor prudent. This decision has been discussed with and concurred in by the Commander, Naval Air Systems Command.

The "grounds for this decision," the Nordwall affidavit then states, "are contained in the attached Report to the Court." Nordwall Affidavit (filed May 13, 1982) ¶ 2. That Report is an unsigned and undated document captioned "Defendant's Report to the Court," to which are attached several letters and memoranda between the Naval Air Systems Command ("NAVAIR") and LGC. In light of the decision NAVAIR has made regarding its legal obligations under the statute and the regulations, the substantive question presented by the Report filed with the Nordwall affidavit is a simple one: has defendant so far provided the rational basis for its decisions regarding this procurement? This question must be answered in the negative.

### A.

NAVAIR had previously identified, and the Court has accepted as valid, three broad management criteria governing NAVAIR's decision to procure SLEP on a sole-source basis from LGC. Under the first criterion —"technical risk"—NAVAIR sought to control the risk that a SLEP contractor will not perform SLEP with an acceptable level

**2.** *See* Motion for Order Requiring Compliance with Prior Order (filed April 29, 1982); Response to Navy's Report (filed May 14, 1982).

**3.** *See* Motion for an Order Requiring Defendant to Show Cause Why It Should Not Be Held in Contempt (filed Jan. 15, 1981); Supplemental Memorandum in Support of Request for Costs and Attorneys' Fees (filed Feb. 1, 1982).

of technical competence. NAVAIR has never taken the position in this litigation that only LGC can perform SLEP with an acceptable level of technical risk; if SLEP contracts were awarded by competition to a firm other than the C–130's manufacturer, LGC, defendant would simply require the contractor to employ kits of parts, tools, and technical papers that would, if properly used, control the technical risk.

The second criterion was preservation of NAVAIR's 1980–1985 SLEP induction schedule. The Court has always declined to interfere with that schedule, inasmuch as the schedule reflects defendant's judgment regarding national-defense requirements for the C–130 fleet. The Court has thus steadily refused plaintiff's original request for even a brief delay in the SLEP induction schedule, even though adherence to that induction schedule has meant that, with each passing month, the number of aircraft left for possible competitive procurement has shrunk.

The third criterion is "prudent" use of public funds in accomplishing SLEP, and it is that criterion that has generated the principal conflict between the GAO's position, taken in the Acting Comptroller-General's opinions, and defendant's approach to this procurement. NAVAIR has been unwilling to develop kits for a competition of SLEP until some firm other than LGC has been determined to be the winner of the competition, since LGC itself would not need kits. The Acting Comptroller-General has taken the position that NAVAIR has seriously overstated the time and resources required to prepare for a kit-based competition. The Memorandum of February 18, 1982, indicated that defendant should attempt to weigh the costs of preparation for a kit-based competition limited to experienced C–130 maintenance firms against possible savings from a competitive procurement in which LGC and other firms would propose to perform SLEP on the best terms they were prepared to offer the government. *Aero Corp. v. Department of the Navy,* 540 F.Supp. 180, (D.D.C., 1982).

The parties have always agreed that assessment of the costs and complexities of SLEP accomplishment should build upon NAVAIR's own technical judgments regarding kit design and procurement. The principal difficulty in NAVAIR's articulation of costs and feasibility, however, has been its stubborn refusal to consider the possibility of competition limited to firms experienced in maintenance of the C–130. The Court first instructed defendant to consider such a limited competition in March 1980. *See Aero Corp. v. Department of the Navy,* 493 F.Supp. 558 (D.D.C., 1980). Notwithstanding the opinions of GAO and this Court's instructions, however, defendant's evaluation of competition has generally assumed that competition should be industrywide. Defendant's planning therefore failed to consider the possibility that limited competition with simpler SLEP kit requirements could spare NAVAIR the time and cost of developing materials needed for a firm with no background in C–130 work. The ECP ordered by NAVAIR from LGC in 1981, for example, assumed industry-wide competition. And when the Court sought to direct that ECP toward narrower but more practicable competition, defendant stubbornly evaded the effort.

Thus, prior to February 1982, despite the Court's Order of March 1980 and GAO's opinions on this procurement, defendant had never systematically considered competition limited to experienced C–130 contractors. In affidavits and testimony in 1981, defendant, after ordering its "industrywide" ECP, attempted to justify its action by asserting that even experienced C–130 maintenance firms would require all the tools and technical directives that any firm in the aerospace industry would require. The Court was obliged to reject defendant's explanations for its refusal to study limited kit-assisted competition as irrational and unsupported by the record. *See Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 212–214 (D.D.C., 1982). As the Court noted at that time, defendant's position on requirements for limited competition was inconsistent with the advice of NAVAIR's own technical personnel, who in 1980 had

conducted on-site inspections of maintenance facilities operated by the likely participants in such a competition. *Id.* at 195–196, 210–211.

According to defendant's May 13, 1982, Report, defendant's principal effort since February 1982 to evaluate the possibility of limited competition for the remaining aircraft has been to request advice from the incumbent contractor, and to "commence[ ] a reevaluation" of the 1981 ECP in order to quantify the requirements of limited competition. Defendant had previously carefully differentiated the 1981 ECP from one appropriate for development of the "tailored" kits designed only for the needs of experienced C–130 contractors, and had led plaintiff and the Court to believe that it would order a new ECP prior to development of the technical directives to be included in a kit for a limited competitive procurement.[4] By contrast, defendant is now prepared to rest the whole burden of justifying its renewed decision not to pursue limited competition on its extrapolations from the old ECP designed for industry-wide competition. If those extrapolations were adequate and plausible, then defendant would be entitled to rely upon the old ECP. But if defendant is now correct in claiming that it needed no new ECP to evaluate limited competition, then its earlier contrary representations in 1981 needlessly retarded this litigation by obscuring from plaintiff and the Court the time and cost of preparing accurate planning documents for a limited competition.

It is only the judgment of NAVAIR that is entitled to deference by the Court, not that of the prime contractor. Yet the only colorably meaningful attempt to quantify the costs and complexities of competition limited to experienced C–130 service firms appears, from defendant's latest Report and

its appendices, to come from LGC itself. According to LGC, defendant's Report states, fully 27 of the 40 SLEP tasks would require full "mil-spec"[5] kits even in a limited competition. LGC's memorandum to NAVAIR dated April 23, 1982,[6] is, moreover, apparently the only basis for NAVAIR's conclusion that "the additional data required for SLEP installation would not differ depending upon whether the installation contractor were an experienced C–130 SDLM contractor or qualified depot maintenance contractors in general." *See* Defendant's Report (filed May 13, 1982) at 6. NAVAIR has thus apparently endorsed those critical conclusions by the sole-source contractor without independently explaining its justification for doing so, or even summarizing the process by which NAVAIR personnel reviewed those LGC determinations. The supporting exhibits to the Report similarly state LGC's position without explaining why, or how, NAVAIR has come to adopt it. Under these circumstances, with the procurement agency employing an arguably obsolete technical document, and its procedure for evaluating the advice of the incumbent contractor unexplained, the Court's present task is extremely difficult.

### B.

Careful review of defendant's Report and the exhibits attached to it demonstrates that the Report is, in effect, an admission which should strongly support a conclusion that NAVAIR's original 1979 SLEP contract decision—to procure SLEP on a sole-source basis—violated 10 U.S.C. § 2304(g) and DAR ¶ 3–101(d). Defendant's Report pointedly omits any systematic attempt to estimate the savings that might be achieved for NAVAIR through the pressures of competition. The Report is similarly silent on

---

4. *See Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 189–190 (D.D.C., 1982); Memorandum and Order, *Aero Corp. v. Department of the Navy,* Civil Action No. 79–2944 (D.D.C., Sept. 28, 1981); Affidavit of E.R. Seymour (filed Oct. 16, 1981) ¶ 9.

5. The term "mil-spec," denoting a level of detail in technical directives and kit parts permit-

ting any military overhaul contractor to perform the assigned tasks, is discussed in *Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 187 (D.D.C., 1982).

6. The memorandum is filed with Defendant's Report of May 13, 1982.

the question whether competition for some aircraft, even allowing all the time LGC would require for kit preparation and validation, could not have been pursued had defendant commenced work on competitive options when it first determined to procure SLEP for the C–130 fleet.

The Court is scarcely in a position itself to estimate, by any measure, potential savings through competition. But no expertise is required to see that if defendant in 1979 had carried out its duty under the procurement law to pursue all competitive possibilities, then even LGC's inevitably self-serving version of a "fiscally prudent" competition of SLEP could have been conducted under NAVAIR's present induction timetable. Defendant has never disclosed to the Court when it was first able to identify SLEP for the C–130 as a long-term procurement requirement; but even assuming the need was not apparent before 1979, when this litigation began, careful attention to the requirements of the procurement law would have permitted competition for at least a dozen aircraft according to kit production schedules LGC and NAVAIR have themselves developed. *See Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 210 (D.D.C., 1982). If, as is likely, the Navy recognized its SLEP requirements much earlier, it might well have been able to complete the entire procurement consistently with the three criteria it has established, including national-defense considerations.

Time has now severely limited the possibilities for competition of the C–130 fleet designated for SLEP. Even accepting GAO's shorter time estimates for kit preparation and validation,[7] only a few aircraft could be inducted into SLEP following competition. Only if the Court directed competition without use of kits, or ordered defendant temporarily to suspend SLEP inductions while kits were prepared, could the

possibilities for SLEP competition that existed in 1979 and earlier years be restored today. To do the former would overturn technical judgments of NAVAIR that are entitled to deference here; to direct the latter would interfere with national-defense determinations by responsible military authorities. The Court will do neither.

According to defendant's cost estimates derived from LGC sources, to conduct a kit-assisted competition today would cost approximately $64 million dollars.[8] Those figures may, however, have been based upon evaluation of the 1981 ECP and defendant's unjustifiable preference for full "mil-spec" kits; the precise derivation of the estimate is uncertain. At an earlier stage of this procurement, the Court would be obliged to require further explanation of defendant's calculations. But, even if defendant has overstated the costs of kit-assisted competition, it is apparent now that the fixed costs of preparing for competition of the remaining fleet could probably not be recovered from the savings gained from competition of the dwindling number of aircraft available for competitive procurement. Moreover, the additional time required for NAVAIR to perfect accurate cost-benefit estimates would reduce further the group of planes over which the fixed costs of kit preparation could be spread.

■ The Court's duty under these circumstances is clear. The Court has already found a substantial likelihood that it will conclude defendant has violated the procurement law and proceeded with an irrational procurement policy that has seriously injured the public interest in efficient and prudent government purchasing, and that has also substantially injured the business interests of Aero Corporation. But the public interest in 1982 will not be served by redirection of the SLEP procurement for the aircraft remaining in defendant's fleet

---

7. The GAO estimate was about one-half that of NAVAIR. *See Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 189–190 (D.D.C., 1982).

8. The estimate appears in a memorandum entitled "Cost Review" and appended to Exhibit 1 of Defendant's Report to the Court of May 13, 1982. Though unsigned, the "Cost Review" document appears to have been written by NAVAIR.

of 49 covered by the present overhaul program. Under the rule of *M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 233, 455 F.2d 1289, 1301 (1971), even an unlawful procurement cannot be enjoined when "overriding public interest considerations" dictate that it go forward. Plaintiff, and the public, have suffered from defendant's failure to identify and to disclose its need for SLEP procurement in time to permit competition; by defendant's efforts in 1979 and 1980 to avoid GAO and judicial review of its early and irrational sole-source procurement decisions;[9] by its failure to pursue competitive options even after the Court had directed it to do so; and by its extraordinary deference to the sole-source contractor (the entity least interested in competition) in performing defendant's own fiscal evaluative responsibilities. But none of that harm can be redressed now, in the context of this procurement for the designated 49 aircraft. Without accepting defendant's Report as any justification for any phase of this sole-source procurement, the Court concludes that no preliminary injunctive relief affecting the remaining sole-source contracts for the fleet of 49 aircraft should issue.

## II.

The determination that the Court should issue no further affirmative injunction affecting the course of the C–130 SLEP procurement for the designated fleet of 49 aircraft, does not, however, terminate the Court's responsibility. Plaintiff has filed motions for an Order holding defendant in contempt of prior Orders of the Court, and seeks attorneys' fees to compensate it for defendant's alleged misconduct in the course of this litigation. Moreover, plaintiff may be entitled to a declaratory judgment that the decisions of defendant precluding it from competition for these SLEP contracts were unlawful. *Cf. Simpson Electric Co. v. Seamans,* 317 F.Supp. 684, 688 (D.D.C., 1970). Defendant has never filed responsive papers stating a defense to the claim for attorneys' fees, and the Court has before it neither a motion for summary judgment nor pretrial briefs that would permit final adjudication of plaintiff's claims.

Pending final disposition of the case, the fact that the Court cannot now alter the course of an apparently unlawful procurement does not relieve it of the obligation to determine whether plaintiff is entitled to some other form of interlocutory affirmative relief. A proximate cause of plaintiff's injury in this case was defendant's failure to notify all interested parties in a timely manner of its intention to award SLEP contracts in 1979 on a sole-source basis. That failure circumscribed the ability of the Court and GAO to provide timely relief from an apparently unlawful course of conduct that, once begun, could not be halted or even delayed without even greater injury to the public interest. Plaintiff's injury could have been reduced had it been able to invoke judicial and administrative remedies more promptly and without interference from defendant; instead, defendant's tactics in the early stages of this SLEP procurement evaded GAO and judicial review. *See Aero Corp. v. Department of the Navy,* 493 F.Supp. 558, 568–69 (D.D.C., 1980).

If defendant did not willfully intend to exclude plaintiff from pursuit of the administrative or judicial remedies contemplated by statute, the Court must conclude that defendant simply did not understand its obligations under the procurement law and the *Scanwell*[10] doctrine of judicial review. This conclusion is confirmed, of course, by defendant's continuing misconstruction of its even more basic obligation to compete its contracts whenever competition is feasible. In the May 13, 1982 Report, for example, defendant claims that there is no "mandate" for competition. "The preference for competition," defendant states in its Report, "is a statutory preference rather than a mandate; that preference does not or should not override national defense com-

---

9. *See Aero Corp. v. Department of the Navy,* 493 F.Supp. 558, 566 (D.D.C.1980).

10. *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970).

mitments." Defendant's Report to the Court (filed May 13, 1982) at 18. No court, before or after *Scanwell,* has ever suggested that 10 U.S.C. § 2304(g) requires competition if competition would adversely affect the public interest in general, or national defense commitments in particular. Defendant in this case has never been prepared to argue, nor could it, that "national defense commitments" required it in 1979 and earlier to procure SLEP for all 49 aircraft on a sole-source basis, or to take steps limiting, if not foreclosing, the opportunity of GAO and the courts effectively to review its decisions to procure SLEP on a sole-source basis. At bottom, defendant's statement in the Report therefore can mean only one thing: if defendant is correct, then the relevant procurement statute and regulations are not law at all, but are merely precatory advice from Congress and the Secretary of Defense to the procurement officer.

As demonstrated in the February 18 memorandum and in the GAO opinions, neither the statutes nor the regulations are as precatory as defendant has assumed. The Court has already discussed fully the statutory framework that has controlled negotiated procurements since 1962. *See Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 203–206 (D.D.C., 1982). The statutes and regulations give more than a "preference" to competition. As Congressman Hebert observed at the time the Armed Services Procurement Act was amended in 1962 to add section 2304(g), Congress intended "to assure that the competitive mechanism will not be used in part but in the fullest and that the American public and the taxpayer himself will ultimately benefit by this method of operation." 108 Cong.Rec. 1970 (June 7, 1962). *See also Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 204 (D.D.C., 1982). Regulations applicable to this procurement promulgated since 1962 placed defendant under additional obligations to evaluate the legitimacy and need for every sole-source procurement and, if possible, to shift a procurement from sole-source to competition. *See* DAR ¶ 3–101(d); *Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 209–

211 (D.D.C., 1982). These Congressional and regulatory determinations that military procurements should be competed embody more than a "preference" for competition.

Decisions like those made by defendant in this case regarding the "feasibility" and "fiscal prudence" of competition are reviewable under the standards created by the statute and regulations. *Aero Corp. v. Department of the Navy,* 540 F.Supp. 180 at 200–201 (D.D.C., 1982). The obligation of defendant to permit the review contemplated by Congress, in this Court and before GAO, thus follows from the duties to pursue competition created by the statute and regulations. Nevertheless, defendant's whole course of dealing with plaintiff in this case suggests that it deems its duty to facilitate GAO and judicial review to be no stronger than the statutory "preference" it perceives in the substantive procurement law. *See, e.g., Aero Corp. v. Department of the Navy, supra,* 493 F.Supp. at 562–66. Indeed, defendant's serious misconstruction of its duty to pursue competition is the only plausible explanation for its early delay of GAO and judicial review, and the inadequacies of its subsequent efforts to reach the critical judgments it has been required to make regarding competition.

Already defendant's neglect of its obligations to permit GAO and judicial review has injured plaintiff. As the former SDLM contractor for the C–130 aircraft scheduled for SLEP, Aero has lost not only the opportunity to compete for SLEP, but also the possibility of performing SDLM for these aircraft at any time in the near future, inasmuch as SLEP of an aircraft removes any short-term need for SDLM. *See Aero Corp. v. Department of the Navy, supra,* 493 F.Supp. at 562. If, pending final adjudication of defendant's duty to restrict its sole-source maintenance procurements, defendant continues to neglect its concomitant obligation to permit review of other maintenance contracting decisions, plaintiff, positioned as it is in the aircraft maintenance industry, will probably suffer further harm to its business interests.

Pending disposition of whatever claim plaintiff now has to a declaratory judgment and other relief, the Court will accordingly direct defendant to show cause on or before July 26, 1982 why this Court should not require defendant to notify plaintiff (and, if defendant chooses, the public) of any intention it forms to procure substantial SLEP or SDLM service for any other aircraft or group of aircraft operated by NAVAIR. The Order would require defendant to give its notice of an intention to procure substantial SLEP or SDLM service as early in the planning process as is possible; the intention to procure SLEP for the first group of C–130 aircraft might, for example, have been announced earlier than it was. *See Aero Corp. v. Department of the Navy, supra,* 493 F.Supp. at 562. This device would reduce the threat that defendant, through its serious misunderstanding of its duties to pursue competition for contracts of this nature, will further preclude plaintiff from seeking relief and correction of unlawful procurement decisions, either before GAO or in the courts.

### ORDER

Upon consideration of plaintiff's Motion for Order Requiring Compliance with Prior Order, defendant's Opposition thereto, the defendant's Report of May 13, 1982 and the entire record, it is this 8th day of July 1982 hereby

ORDERED, ADJUDGED, and DE-CREED: that plaintiff's Motion for Order Requiring Compliance with Prior Order is denied without prejudice to any claim plaintiff may have for sanctions on account of defendant's alleged violation of this Court's Order of February 18, 1982, or for attorneys' fees; and it is further

ORDERED, ADJUDGED and DE-CREED: that defendant shall, on or before July 26, show cause why this Court should not enter an interlocutory order requiring defendant to give plaintiff advance notice of any intention it forms to contract to procure any substantial SLEP or SDLM service for aircraft or group of aircraft operated by NAVAIR; and it is further

ORDERED: that a status call will be held on July 26, 1982, at 9:30 a.m., to schedule further motions, pretrial proceedings, or, if necessary, a trial on the merits of plaintiff's claims for declaratory relief, a contempt judgment, sanctions and attorneys' fees.